1   Tamara Holder (*pro hac vice forthcoming*)
    tamara@tamaraholder.com
2   **THE LAW FIRM OF TAMARA N. HOLDER, LLC**
    917 W. Washington Blvd., Ste. 222
3   Chicago, Illinois 60607
    Telephone: (312) 440-9000
4
    William J. Quinlan (*pro hac vice forthcoming*)
5   wjq@quinlanfirm.com
    Lisa H. Quinlan (Cal. Bar No. 108549)
6   lquinlan@quinlanfirm.com
    Eric T. Schmitt (Cal. Bar No. 331174)
7   eschmitt@quinlanfirm.com
    **THE QUINLAN LAW FIRM, LLC**
8   233 South Wacker Drive, Suite 6142
    Chicago, Illinois 60606
9   Telephone (312) 629-6022
    Facsimile (312) 630-7939
10
    Jeff Augustini (Cal. Bar No. 178358)
11  jeff@augustinilaw.com
    **LAW OFFICE OF JEFF AUGUSTINI**
12  100 Bayview Circle, Suite 210
    Newport Beach, California 92660
13  Telephone: (949) 336-7847
14  *Attorneys for Plaintiff Jane Doe*
15
                  **UNITED STATES DISTRICT COURT**
16                **CENTRAL DISTRICT OF CALIFORNIA**
17
    Jane Doe, an individual,                  **CASE NO.:**
18
                  Plaintiff,                   **COMPLAINT FOR:**
19
    v.                                         1.  Forced Labor and Sex Trafficking in
20                                                 Violation of the TVPRA (18 U.S.C. §§
                                                   1589, 1591, 1595)
21  Jonathan Barnett, an individual;          2.  Participating in a Venture in Violation of
    Creative Artists Agency, LLC, a               the TVPRA (18 U.S.C. §§ 1589, 1591,
22  Delaware limited liability company; CAA       1595)
    Holdings, LLC, a Delaware limited         3.  Benefitting from Violations of TVPRA (18
23  liability company; CAA Stellar Sports         U.S.C. § 1595)
    Limited *f/k/a* ICM Stellar Sports Limited 4. Benefitting from Violations of the TVPRA
24  and *f/k/a* The Stellar Group Limited, a      (18 U.S.C. § 1595)
    United Kingdom limited company; CAA        5.  Conspiracy to Violate the TVPRA (18
25  Stellar Football Limited *f/k/a* Stellar      U.S.C. §§ 1594(b), 1595)
    Football Limited, a United Kingdom         6.  Damages for Sexual Assault Under Cal.
26  limited company;                              Code Civ. Pro. § 340.16; Civil Conspiracy
    and DOES 1 through 10, inclusive,          7.  Negligent Retention, and Supervision
27                                             8.  Negligent Hiring, Retention, and
                  Defendants.
28

─────────────────────────────────────

                        Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Supervision
9.  Negligent Hiring Retention, and Supervision
10. Intentional Infliction of Emotional Distress
11. Common Law Negligence
12. Negligence *Per Se*

**REQUEST FOR PUNITIVE DAMAGES**

**DEMAND FOR JURY TRIAL**

---

**COMPLAINT**

Plaintiff, Jane Doe, alleges as follows:

**<u>INTRODUCTION</u>**

1.      This is a case about institutional abuse at the highest level. This case is about how one of the world's most powerful men in sports openly kept a sex slave for years, with the assistance of his employees, accountants, emissaries, and family members, and used his money and power to maintain coercive control over her and keep her in fear for her life and the lives of her children. This is a case about how a trusting woman quickly fell into the hands of a professional predator who would not allow her to break free of his grip over every part of her life, by threatening her with extortion and defamation, and even threatening to kill her if she ever spoke out.

2.      Jane Doe ("Ms. Doe" or "Plaintiff") is filing this Complaint as a freed survivor of forced labor trafficking, sex trafficking, extreme sexual abuse, depraved gender violence, and torture by CAA Stellar Executive Chairman Jonathan Ian Barnett, who, in 2019, was named the *No. 1 World's Most Powerful Sports Agent* by *Forbes*.

3.      Defendant Jonathan Ian Barnett, individually, and through his world-renowned sports agency, Defendant CAA Stellar Sports Limited (previously *d/b/a* ICM Stellar Sports and the Stellar Group), engineered a master plan to lure Ms. Doe into his complete control, *as a sex slave*, through financial bondage, incessant and brutal bodily harm, and sexual assault, including, but not limited to, rape in excess of 39 times, and repeated threats to her life and the lives of her minor children.

4.      In 2016, London-based sports agency Defendant Stellar Group Limited expanded into the United States where it began to represent NFL-bound athletes and veterans alike. The following year, in 2017, the Stellar Group purchased Boston-based soccer agency Global Premier Management and rebranded it "Stellar USA Soccer."

5.      With offices in Atlanta, New York City, Boston, and Orlando, coupled with its high-value client list, the Stellar Group caught the attention of Los Angeles-based, worldwide talent agency, International Creative Management Partners, LLC. ("ICM" or "ICM Partners"). As a result, in October 2020, ICM purchased the Stellar Group, and its various subsidiaries, and renamed it "ICM Stellar Sports Limited" ("ICM Stellar"). ICM Stellar now had additional U.S. offices in Washington, D.C., and Los Angeles.

6.      In 2021, ICM announced its merger with Los Angeles-based worldwide talent agency Creative Artists Agency ("CAA"), which was completed in June 2022, following approval from the Department of Justice. ICM Stellar was rebranded one final time as Defendant "CAA Stellar Sports Limited" ("CAA Stellar") solidifying CAA's status as the number-one sports agency in the world, managing over $14 billion in active playing contracts and $3.8 billion in non-playing contracts. *See* Brett Knight, *The Most Valuable Sports Agencies of 2022, The Rich Get Richer Amid a Wave of Consolidation*, at https://www.forbes.com/sites/brettknight/2022/11/17/the-most-valuable-sports-agencies-2022-the-rich-get-richer-amid-a-wave-of-consolidation/ (last updated Nov. 17, 2022).

7.      And yet, both ICM and CAA—two of the biggest talent agencies in the world—failed to find and/or willfully or recklessly disregarded that CAA Stellar made substantial payments to Ms. Doe on multiple occasions between 2017 and 2023, and used its employees and emissaries to assist Barnett in keeping Ms. Doe as his sex slave. Given that Ms. Doe was not a CAA Stellar athlete or sports agent, this conduct should have raised numerous red flags for Defendants to inquire into the nature of these payments and the relationship the company had to the persons they were tasked with assisting. Defendants also turned a blind eye to emails and other communications between Barnett and Ms. Doe, on company-owned devices, through company-monitored accounts, in which Barnett referred to Ms. Doe as

1    "slave" and told her to "get back to work."

2        8.    CAA Stellar even facilitated Ms. Doe's child's move to South Korea,

3    obtaining a visa for the child off the books and paying for the child's housing,

4    which Barnett used to control Ms. Doe.

5        9.    Barnett was either operating in plain sight or Defendants choose

6    willful blindness to obvious red flags of Barnett's human rights abuses.  Either

7    scenario is reprehensible.

8        10.    Ms. Doe brings this action, not only to seek redress for the harm

9    caused by Defendants, but also to give a voice to Defendants' other potential

10    victims—both known and unknown—in an industry in which allegations such as

11    Ms. Doe's are ignored until the victim refuses to remain silent and demands

12    accountability and compensation for the psychological and physical damages,

13    including, here, a chronic injury that will last her entire lifetime.

14                                **PARTIES**

15        11.    Plaintiff, Ms. Doe, has been identified by pseudonym because this

16    matter is of a highly sensitive and personal nature, and public disclosure of her

17    identity may subject her to further embarrassment, shame, and emotional harm.

18    Defendants already know of Plaintiff's identity. Plaintiff will subsequently file a

19    motion requesting leave from the Court to proceed under pseudonym.

20        12.    Ms. Doe is a citizen of Australia and currently residing in Australia.

21    Between 2017 and 2023, Barnett, with the assistance of other defendants,

22    trafficked, threatened, tortured, and held Ms. Doe in bondage at numerous places

23    throughout the world, including Los Angeles, California.

24        13.    While not parties to this action, Ms. Doe's children were present

25    during some of the instances herein. They are referred to as Child 1 and Child 2,

26    respectively. In July 2017, when Ms. Doe was trafficked to London from Australia,

27    Child 1 was 14 years old, and Child 2 was 15 years old.

28        14.    Defendant Jonathan Ian Barnett is a citizen of the United Kingdom

and, upon information and belief, currently resides therein. Defendant Barnett lured Ms. Doe into his scheme of sex trafficking and forced labor under the auspices of hiring her to work for his sports agency, CAA Stellar. Prior to Ms. Doe moving to the U.K., Barnett wired Ms. Doe $9,000.00 AUS to cover the moving expenses for herself and her children, which he promised was part of the employment package. Among other things, as part of her bondage, Defendant Barnett directed Ms. Doe to "hunt" for additional sex slaves in Los Angeles. Throughout the relevant period, Barnett regularly conducted business in the United States generally and California specifically.

15.    Defendant CAA Stellar Sports Limited ("**CAA Stellar**") is a private limited company incorporated under the laws of the United Kingdom. CAA Stellar was co-founded by Defendant Barnett and David Manasseh in or around 1994. For clarity, Defendant CAA Stellar is referred to herein as CAA Stellar at all times, including when it was conducting business as the Stellar Group Limited and ICM Stellar Sports Limited, respectively.

16.    On or about May 31, 2016, CAA Stellar opened its first U.S. office in Atlanta, Georgia. Then upon acquiring U.S. sports agency, Global Premier Management, in 2017, CAA Stellar opened offices in New York City, New York; Boston, Massachusetts; and Tampa, Florida.

17.    On or about October 27, 2020, Los Angeles-talent agency ICM Partners purchased CAA Stellar, and renamed the agency "ICM Stellar Sports Limited." On or about the time ICM Partners acquired CAA Stellar, CAA Stellar opened offices in Washington, D.C., and Los Angeles, California. ICM appointed some of its top Los Angeles-based executives to the new ICM Stellar Board of Directors, including Steven Stanford, Jonathan Perelman, Richard Levy, and Theodore Chervin. Perelman was named President of ICM Stellar.

18.    From October 27, 2020, through June 2022, the controlling party of CAA Stellar was TLBFP II LLC, a California limited liability company, located in

1  Los Angeles, California.

2       19.    Defendant Creative Artists Agency, LLC ("**CAA**"), is a Delaware

3  limited liability company with its principal place of business in Los Angeles,

4  California. At all times material hereto, CAA has conducted business in Los

5  Angeles, California. CAA is a leading sports and entertainment talent agency, with

6  offices worldwide, and represents many top athletes and entertainers.

7       20.    Defendant CAA Holdings, LLC ("**CAA Holdings**") is a Delaware

8  limited liability company with its principal place of business in Los Angeles,

9  California. At all times material hereto, CAA has conducted business in Los

10  Angeles, California.

11       21.    Defendants CAA and CAA Holdings are referred to herein,

12  individually and collectively, as the "**CAA Entities**."

13       22.    On or around June 2022, Defendant CAA Entities acquired and

14  merged with ICM pursuant to Delaware law (the "**CAA-ICM Merger**"). As a

15  result of the CAA-ICM Merger, CAA Entities assumed liability for all ICM's debts

16  and liabilities. On information and belief, after the CAA-ICM Merger, there was a

17  continuity of management, personnel, physical location, assets, and general

18  business operations of ICM as a part of the CAA Entities.

19       23.    Upon information and belief, ICM Partners was Barnett's joint

20  employer (Barnett was ICM's employee and agent) from in or around October

21  2020, when ICM acquired CAA Stellar, until the CAA-ICM Merger in June 2022

22  when CAA merged with ICM and all of its affiliated entities, including CAA

23  Stellar.

24       24.    After the ICM-CAA Merger, Los Angeles-based Stanford, Perelman,

25  and Chervin remained on the new CAA Stellar Board of Directors. The largest

26  parent entity that controlled CAA Stellar from June 2022 through 2023 was CAA

27  Holdings.

28       25.    Defendant CAA Stellar is a division of CAA. At all times material

hereto, Defendant CAA Stellar has conducted business in California and has been an employer whose employees have conducted business in California.

26.    Defendant Stellar Football Limited, now doing business as CAA Stellar Football Limited ("**Stellar Limited**"), is a private company incorporated under the laws of the United Kingdom and is a wholly owned subsidiary of CAA Stellar. Defendants CAA Stellar and Stellar Limited are alter egos of each other and operate as a single enterprise for purposes of personal jurisdiction and liability. At all relevant times herein, both companies shared all facets of control, including their board of directors and management. Both Defendants are treated as one company without regard to their respective corporate forms.

27.    Defendant CAA Stellar and Defendant Stellar Limited are referred to herein, collectively and individually, as the "**Stellar Group**."

28.    Upon information and belief, Defendant CAA was Barnett's joint employer (and Barnett was CAA's employee and agent) from on or around June 2022, when CAA merged with ICM Partners, until early March 2024, when Barnett publicly "retired" and quietly resigned from the Stellar Group Defendants respective boards of directors and other positions of leadership within other Stellar Group and CAA Entities.

29.    Upon information and belief, the corporate entity then employing Barnett (*i.e.*, Stellar Group from 2017 to on or around October 2020, ICM from in or around October 2020 to in or around June 2022, and CAA from on or around June 2022 to March 2024) had the power to hire and fire Barnett, set his pay, and control his work conditions.

30.    Plaintiff is unaware of the true names or capacities of the defendants sued herein under the fictitious names DOES 1 through 10, but prays for leave to amend and serve such fictitiously named defendants once their names and capacities become known.

31.    Plaintiff is informed and believes, and thereon alleges, that DOES 1

through 10 are the partners, agents, owners, shareholders, managers, or employees of Barnett, the Stellar Group and/or the CAA Entities and were acting on behalf of Barnett, the Stellar Group, and/or the CAA Entities at all relevant times. Plaintiff is informed and believes, and thereon alleges, that each and all the conduct alleged herein was performed by or is attributable to Barnett, the Stellar Group, the CAA Entities, and DOES 1 through 10, each acting as the agent for the other, with legal authority to act on the other's behalf. As such, Barnett, the Stellar Group, the CAA Entities, and DOES 1 through 10 are collectively referred to as "Defendants" and the term "Defendants" as used throughout this Complaint also expressly includes DOES 1 through 10. The conduct of any and all Defendants were in accordance with, and represent the official policy of, each and every one of the Defendants.

## **JURISDICTION & VENUE**

32.    This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff brings this action under the federal Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595 ("TVPRA").

33.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein are part of the same nucleus of operative facts.

34.    Pursuant to 18 U.S.C. § 1596(a), this Court has extra-territorial jurisdiction over Plaintiff's claims arising under the TVPRA because the offenders were present in the United States, irrespective of nationality, and/or specifically targeted United States citizens. Among other things, Plaintiff was initially trafficked through Los Angeles, California and subsequently forced to return to Los Angeles by Defendant Barnett to "hunt for additional slaves" as part of his deviant scheme to recruit additional women into his commercial sex trafficking, sexual servitude, and forced labor scheme.

35.    This Court has specific personal jurisdiction over Defendant Barnett and can exercise it in this matter to satisfy due process requirements because

Barnett has the "certain minimum contacts" with this District such that maintenance of a suit arising out of those contacts does not offend the traditional notions of fair play and substantial justice. Barnett purposefully directed his activities, both in knowingly engaging in sex trafficking activities, or attempts thereof, in Los Angeles, and by entering into multiple transactions with companies that are domiciled in Los Angeles. Additionally, CAA Stellar has maintained an office in Los Angeles and has been conducting business therein. In all of these activities, Barnett has purposefully availed himself of the privileges of conducting activities in this forum, thereby invoking the benefits and protections of its laws.  The claims arise out of and relate to Barnett's forum-related activities.

36.     Additionally, on information and belief, in April 2025, Barnett was arrested by the London Metropolitan Police in relation to some of the allegations herein, including rape and causing grievous bodily harm, at Heathrow Airport upon his return from the United States. *See* Luke Power, *Leading football agent 'arrested after being accused of rape' - as police 'launch investigation' into man who has worked with Premier League stars*, at
https://www.dailymail.co.uk/sport/football/article-14537963/amp/Football-agent-arrested-rape-Premier-League.html (last updated Apr. 4, 2025).

37.     Upon information and belief, Barnett's arrest was delayed because he could not be arrested in the United States without the U.K. police seeking extradition rights. Indeed, Barnett has traveled to the United States in the past to avoid U.K. legal proceedings. *See* Andre Rhoden-Paul, *Football agent's Bentley caught speeding at over 90 mph*, at
https://www.theargus.co.uk/news/15647441.football-agents-bentley-caught-speeding-at-over-90mph/ (last updated Nov. 8, 2017).

38.     This Court has personal jurisdiction over the Stellar Group because CAA Stellar maintains an office in Los Angeles, and Defendants knowingly conspired, aided and abetted, and facilitated Barnett's sex trafficking venture

1  through actions that occurred in the state of California.

2      39.    In the alternative, this Court has jurisdiction over the non-resident

3  Defendants—Barnett, CAA Stellar, and Stellar Limited—pursuant to Federal Rule

4  of Civil Procedure 4(k)(2) because these claims arise under federal law, the three

5  defendants are not subject to general personal jurisdiction in any State's courts, and

6  exercising jurisdiction over Barnett, CAA Stellar, and Stellar Limited is consistent

7  with the United States Constitution and laws. Based on the facts discussed herein,

8  all three Defendants have connections with the United States that are sufficient to

9  satisfy the requirements of due process.

10      40.    Venue is proper in this District under 28 U.S.C. § 1391(b), because a

11  substantial part of the events or omissions giving rise to Plaintiffs' claims occurred

12  in this District, and Defendants CAA Entities have principal places of business in

13  Los Angeles. In addition, upon information and belief, all other Defendants

14  maintained an ongoing presence and role and regularly conducted business in this

15  District.

16      41.    Venue in this Court is appropriate in that 18 U.S.C. § 1595 authorizes

17  Ms. Doe to bring a civil action in any appropriate United States District Court, and

18  18 U.S.C. § 1391(b)(3) permits a civil action to be brought in "any judicial district

19  in which any defendant is subject to the court's personal jurisdiction to such

20  action."

21      42.    Venue is also proper under 28 U.S.C. § 1391(c), as Defendants are

22  subject to personal jurisdiction in the state of California.

23                          **LEGAL BACKGROUND**

24  ***The Trafficking Victims Protection Reauthorization Act (the "TVPRA"), 18***

25  ***U.S.C. § 1595***

26      43.    The U.S., the U.K. and Australia are all parties to and have ratified the

27  U.N. Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially

28  Women and Children—Annex II to the United Nations Convention Against

Transnational Organized Crime (the "Palermo Protocol"), G.A. Res. 55/25, U.N. Doc. A/RES/55/25 (Jan. 8, 2001) (ratified by the United States). The Palermo Protocol is the first legally binding instrument with an internationally recognized definition of human trafficking. More than 150 countries have ratified the Palermo Protocol on human trafficking, which requires its participants to establish sex trafficking by force, fraud, or coercion as a criminal offense. *See* Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, Arts. 5, 3(a), Nov. 15, 2000, 2237 U.N.T.S. 319, 344–45. Countries that ratify the Palermo Protocol must criminalize human trafficking and develop anti-trafficking laws in line with the Palermo Protocol's legal provisions.

44.     In response to the Palermo Protocol, the United States Congress enacted the Trafficking Victims Protection Act and, subsequently the Trafficking Victims Protection Reauthorization Act ("TVPRA"). Congress intended the TVPRA to address human trafficking at both a national and international level. Its express objective was to reach certain types of conduct and the resulting harm *both at home and abroad*. (emphasis added) *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106–386 § 102, 114 Stat. 1464, 1466–69 (congressional finding that "[a]t least 700,000 persons annually" are trafficked "within or across international borders," and trafficking in persons is a "growing transnational crime").

45.     Under Section 1595(a) of the TVPRA, "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees." 18 U.S.C. § 1595(a).

1    46.    In addition to any domestic or extra-territorial jurisdiction otherwise
2    provided by law, the courts of the United States have extra-territorial jurisdiction
3    over certain enumerated offenses of the TVPRA, or any attempt or conspiracy to
4    commit such an offense) if: (1) an alleged offender is a national of the United States
5    or an alien lawfully admitted for permanent residence; or (2) an alleged offender is
6    present in the United States, irrespective of the nationality of the alleged offender.
7    18 U.S.C. § 1596(a).

8                          **FACTUAL ALLEGATIONS**

9    ***Defendants Barnett and the Stellar Group***

10    47.    Upon information and belief, the Stellar Group was formed on or
11    about 1994, by David Manasseh ("Manasseh") and Defendant Barnett. Initially
12    cricket and rugby agents, Manasseh and Defendant Barnett then expanded their
13    agency into representing professional soccer players, where they proceeded to
14    establish their dominance in sports representation.

15    48.    On or about February 27, 2001, Defendant Barnett and Manasseh
16    incorporated Defendant CAA Stellar in the United Kingdom.

17    49.    The CAA Stellar business model, created and implemented by
18    Defendant Barnett and Manasseh, focused on working with younger athletes and
19    their families by offering a full-service management service for the athletes and
20    their families. "What Stellar does is offer a full 360-degree service so athletes know
21    we are taking care of everything that is in their interests – negotiations, legal
22    matters, image rights, endorsements and so on – leaving them to concentrate on
23    performing and winning," according to Defendant Barnett.

24    50.    In 2013, Defendant Barnett was credited with "masterminding" a
25    world-record deal for his client, Gareth Bale, with Real Madrid for a transfer fee of
26    100 million euros.  Mr. Bale became a pro footballer when he was still a teenager.
27    In 2006, at the age of just 16 years and 275 days, Mr. Bale joined the Southampton
28    Football Club, as its second youngest player ever. Mr. Bale remained a long-term

1  client of CAA Stellar, with Defendants Barnett and CAA Stellar facilitating the

2  final deal of his career, in June 2022, in which Mr. Bale played for the Los Angeles

3  F.C.

4      51.    By 2016, CAA Stellar had entered the U.S. market, opening an office

5  in Atlanta, Georgia.

6      52.    In 2017, CAA Stellar purchased Boston-based soccer agency, Global

7  Premier Management, rebranding this American entity as Stellar USA Soccer. At

8  the time of its purchase, Global Premier Management had offices in New York

9  City, Boston, and Orlando—thus expanding CAA Stellar's presence in America

10  even further.

11  ***Defendants Barnett and the Stellar Group Have a Public History of Dishonesty***

12  ***and Questionable Business Practices.***

13      53.    On or about September 2006, Barnett was found guilty by the Football

14  Association ("FA") for arranging a secret meeting in a hotel room between his

15  client, Ashley Cole, ("Cole") and Chelsea Football Club representatives while Mr.

16  Cole was still under contract with Arsenal Football Club. Despite publicly

17  maintaining his innocence and being "appalled" by the allegations levied against

18  him, the FA found Barnett guilty of "failing to respect the rights of a third party,"

19  banned him for 18 months, and fined him £100,000. *See* Sean Ingle, *Cole's agent*

20  *banned for nine months*, at

21  https://www.theguardian.com/football/2006/sep/26/newsstory.sport10, (last updated

22  Sept. 26, 2006). Additionally, the FA fined Mr. Cole £100,000 for being

23  manipulated by his agent, Defendant Barnett, into the secret meeting when he had

24  2.5 years left on his contract.

25      54.    In sentencing Barnett, the FA said, "[t]here is a need in this case for an

26  element of deterrence. We are satisfied Mr. Barnett was a prime mover in the

27  setting up of the meeting. We consider this a most serious case of its kind." *Id*.

28  Barnett then lost his appeal.

55.     Upon information and belief, later reports revealed that Barnett also attempted to negotiate his cut of the new deal during that meeting.

56.     Barnett uses the media to create smokescreens around his reputation. As just one example, despite denying the allegations at the time, Barnett later admitted to his participation in the Cole scheme, stating, "it was the right move."

57.     At the time, Cole's lawyer, who despite the glaring conflict was also one of the three shareholders of Stellar Limited, compared soccer to slavery, stating " English football has lost the message that a footballer is an employee. It is more like the master and servant relationship of centuries ago."

58.     In 2007, former Luton Town chairman Bill Tomlins confessed to FA lawyers, who were investigating allegations of club corruption, that he (Mr. Tomlins) had made an unauthorized payment to CAA Stellar, representing Kevin Nicholls, in the amount of £7,500.

59.     In 2014, CAA Stellar was investigated for tax evasion, allegedly orchestrated between Barnett and Melvin Gandz, founding partner of accounting firm BSG Valentine. Upon information and belief, Barnett allegedly promised Gandz a payoff for "cleaning it up."

60.     As early as 2017, Defendant Barnett was already evading the English legal system by spending his time in the United States. In November 2017, Defendant Barnett refused to appear in court in the U.K. to answer charges issued to his Stellar-owned Bentley Continental convertible that was caught on speeding cameras the year prior. When the court summoned Barnett to appear, he refused, instead choosing to come to the United States to negotiate a deal. As discussed above, upon information and belief, Defendant has a history of avoiding the U.K. legal system by spending his time in the United States.

61.     In 2018, Mr. Manasseh was found guilty by the FA, despite his denial, for allegedly steering a 15-year old player to sign with CAA Stellar, with the help of other CAA Stellar associates, including CAA Stellar assistant Gina Mazzarelli.

62.   In 2022, Barnett sued his former partners who left Stellar after learning he sold the company to ICM Partners behind their backs, despite previously promising them a cut of the sale. In the former partners' responsive pleadings, they alleged that Barnett engaged in a payment scheme that included working off "debts," and paying for their kids' schooling.

***Defendant Barnett Lures Ms. Doe into Slavery with a "Life-Changing" Career Opportunity***

63.   In the mid-1990's, Ms. Doe's friend, who was at the time a professional athlete, introduced her to Defendant Barnett and Mr. Manasseh, who were his then-agents, at their new Stellar offices in London.

64.   Mr. Manasseh offered to help Ms. Doe in obtaining summer employment, which she accepted. At the summer's end, Ms. Doe left England, moved on with her life and did not remain in contact with either Barnett or Manasseh.

65.   Decades later, on or about April or May 2017, Barnett sent Ms. Doe a private message, via LinkedIn, a professional networking site, whereby he stated something to the effect of, "Nice pic." Initially, Ms. Doe was flattered that Barnett remembered her.

66.   Ms. Doe googled Barnett and saw a plethora of positive articles about him, specifically that he was still leading the Stellar Group, had built a prolific career, and that he often spoke about his family values and devoutness to his religion.

67.   After an exchange of niceties, Ms. Doe mentioned to Barnett she was traveling through London in the coming weeks. In response, he invited her to lunch when she was in town.

68.   Ms. Doe met Barnett, on or about Friday, May 12, 2017, at "George," an exclusive members-only restaurant in Mayfair London, where Barnett and/or CAA Stellar was a member. Ms. Doe wore a black trouser suit, button down shirt

and flat shoes. Ms. Doe recalls Barnett being very specific for the timing of the lunch, that it was a quarter past the hour. When Ms. Doe arrived, Barnett was already seated, and she was led straight to his table.

69.    Barnett dominated most of the conversation, talking mostly about his work, his traditional upbringing, family - that he was married to his wife, Nava, (former director of Stellar Limited), and proud of his three sons, including Joshua Barnett (managing director of CAA Stellar), and Edward Barnett (COO and IT Manager of CAA Stellar).

70.    Barnett and Ms. Doe also discussed their religious upbringing and Barnett talked about being a devout practitioner of Judaism. In fact, Ms. Doe's children had attended a Jewish preschool, so she felt that she and Barnett had common beliefs and values.

71.    Ms. Doe told Barnett she was actively looking for employment, had worked in a variety of administrative and mid-level management roles, and that she was a single parent with two minor children. In response, he said, something to the effect of, "*I am Stellar.* You should come work for me." Barnett then told Ms. Doe to move to London, with her children, and work for him at CAA Stellar.

72.    Also during this lunch, Barnett handed Ms. Doe his business card that stated he was Chairman of the Stellar Group. During the years that followed, Ms. Doe saw Barnett give out his business card to try to impress and lure potential victims on numerous occasions.

73.    Following lunch, Ms. Doe returned home to Australia that same day. Barnett then engaged in high-pressure recruiting tactics, contacting Ms. Doe on a daily basis, sometimes multiple times a day.

74.    Barnett's sales pitch was fast, professionally smooth and convincing. He told her, "My business is helping people. I want to help you too." Ms. Doe had no reason not to believe Barnett; in fact, she trusted him.

75.    As part of his sales pitch to Ms. Doe, Barnett promised her an

employment package that ensured everything would be taken care of by CAA Stellar, including:

      a.  Payment for moving expenses;

      b.  Company sponsorship to support the arrangement and cost of Ms. Doe's working visa and her children's visas;

      c.  Payment of school tuition and boarding fees for her children at elite boarding schools;

      d.  A starting salary of 4,000 pounds per month;

      e.  Housing; and,

      f.  A summer performance bonus.

76.    Within just a matter of weeks of their initial meeting, Barnett had convinced Ms. Doe to remove her children from school, terminate her car and apartment leases in Australia, and sell her belongings for "an opportunity of a lifetime" for both herself and her children.

77.    Barnett pushed for expediency, stressing that her children needed to interview and enroll in their new U.K. schools by the beginning of the 2017 schoolyear, which started in or about September 2017.

78.    On or around June 28, 2017, Barnett wired $ 9,000.00 AUS to Ms. Doe to cover her moving expenses, as an explicit assurance that she could trust Barnett's offer.

79.    On or around July 2017, Ms. Doe and her 14-year-old child, Child 1, were trafficked by Barnett to London via Los Angeles, California. At Barnett's direction and using airline tickets purchased by Barnett and/or the Stellar Group, they entered the United States via U.S. Immigration at Los Angeles International Airport ("LAX"). Shortly thereafter, Doe and her children then travelled from Los Angeles to London.

80.    After Ms. Doe moved to London, with Child 1 and Child 2, who were aged 14 and 15 respectively, Barnett began to exercise coercive control and debt

bondage over Ms. Doe. Barnett used Ms. Doe's children as further leverage to ensure complete obedience to all his demented demands.

81.    Upon her arrival in London, Ms. Doe initially stayed in a hostel because, according to Barnett, he was still finalizing her living arrangements, and Ms. Doe could not afford other accommodations. Barnett messaged Ms. Doe, "Welcome to London," then told her they would soon meet in Central London to set up her new job.

82.    Specifically, Barnett instructed Ms. Doe to meet him during the day in a hotel room. Ms. Doe did not think this request was odd given that he told her that he often held business meetings at hotels and in hotel suites.

83.    When Ms. Doe opened the door into the hotel room, she found herself standing inside of a massive suite. As if a switch had flipped, Barnett's demeanor changed. Barnett was suddenly direct and aggressive. Barnett told Ms. Doe that she was not allowed to speak or look at him, that he "owned" her and she was now his slave, and she "owed him" for the opportunity he was giving her.

84.    Barnett further told Ms. Doe that, moving forward, she was to refer to him as "my Master" and that she would be killed, and her children disadvantaged, if she ever spoke out.

85.    Through a series of threatening and brute force actions, Barnett then proceeded to rape Ms. Doe. When Barnett first ordered Ms. Doe to remove her clothes, Ms. Doe asked to go to the bathroom and tried to console herself to no avail. Still crying, Ms. Doe re-entered the room, after which she was struck by Barnett when she tried to speak. He hit her again when he saw Ms. Doe looking at herself, crying, in the mirror behind the bed.

86.    Realizing she was powerless against a dangerous predator, Ms. Doe submitted to Barnett in order to avoid being severely beaten or even killed.

87.    Barnett then instructed Ms. Doe to find a "suitable" apartment located near Stellar Group's offices. She did not know then but now knows that Barnett

1 | wanted to house Ms. Doe in plain sight, near his home and workplace, and in an
2 | area that would not raise red flags to her family.

3 |      88.    At all times relevant Barnett abused Ms. Doe in person and remotely—
4 | via WhatsApp, text messages, phone calls, and company email accounts—when he
5 | visited the United States, including California, and other countries around the
6 | world.

7 | ***Defendant Barnett Quickly Masterminded Plaintiff's Existence and Took***
8 | ***Complete Command Over All Aspects of Her Life.***

9 |      89.    Barnett was clearly experienced in trafficking: he identified Ms. Doe
10 | and targeted her on LinkedIn, he lured her to the U.K. through the use of false
11 | promises, he removed her from her home country, forced her complete dependency
12 | on him, isolated her from her friends and family, and broke Ms. Doe down through
13 | torture, threatening behavior, and strict rules designed to deprive her of sleep,
14 | impose total power over her life, and create the constant state of fear in which Ms.
15 | Doe lived.

16 |      90.    No matter where Barnett was, he commanded control of Ms. Doe's
17 | every action. Barnett sexualized her entire existence, obsessively messaged her
18 | dozens of times throughout the day and night, and forced her to act in humiliating
19 | ways.

20 |      91.    Barnett laid out strict and explicit rules, behaviors, routines, rituals,
21 | and conditions on Ms. Doe, including, but not limited to the following:

22 |         a.  Must obey him at all times;
23 |         b.  Bow to him in "servitude" every morning and night over Facetime;
24 |         c.  Respond to him without fail or delay at all times of the day and
25 |            night;
26 |         d.  Always respond to him, "Yes My Master," and requiring that she
27 |            capitalize both "My" and "Master." Barnett only referred to Ms.
28 |            Doe by "slave," and never used her real name;

1     e. Never say no to him;

2     f. "Never say it hurts;" and

3     g. "You are to have no thoughts of your own."

4    92. If Ms. Doe did not follow Barnett's rules to his liking, he subjected her

5 to further abuse.

6    93. Barnett told Ms. Doe that if she complied, "all will work out for you."

7    94. Ms. Doe had to complete tedious, daunting, time-consuming tasks. As

8 just one example, he demanded she write, "I am less than nothing without you, My

9 Master" 500 times before she could eat breakfast.

10    95. Barnett always reinforced his power: he would kill her if she tried to

11 leave; she would never be believed over him if she ever went to the police; and, his

12 powerful contacts were limitless.

13    96. When Barnett visited the apartments where he kept her–only during

14 the workday–he tortured, injured, raped, and violently assaulted Ms. Doe.

15    97. On the days that he visited hotel rooms and the apartment to meet the

16 other "slaves" that Ms. Doe was responsible for finding on his behalf, he would

17 demand that they take off their clothes and watch him violently beat Ms. Doe while

18 threatening, "do you want her to have more of that?" in order to get them to comply

19 with his demands.

20    98. When Barnett was not in her physical presence, he digitally stalked,

21 monitored and abused Ms. Doe at all hours of the day and night, via numerous

22 means, including his work phone, work email, FaceTime and WhatsApp.

23    99. Barnett exuded confidence in his conduct, and acted with skill, as

24 someone with experience in coercive control, trafficking and prostitution would act.

25    100. Barnett compared her to his experience with other slaves, writing,

26 "you are my best slave."

27    101. Barnett was clearly experienced with controlling a victim, telling Ms.

28 Doe "It's hard for everyone in the beginning" and "You need serious obedience

1  training."

2      102.   The following month, in September 2017, Barnett gave Ms. Doe the
3  following instructions: "Never question anything you are told to do no matter how
4  painful or humiliating."

5      103.   To control Ms. Doe's residency in the U.K., as well as her dependence
6  on him for housing, Barnett paid for and guaranteed the apartment leases where he
7  kept her. Barnett signed for the flats in his official capacity as Chairman of CAA
8  Stellar. CAA Stellar's accounting firm, BSG Valentine, guaranteed the Ms. Doe's
9  leases. Barnett used finances to control Ms. Doe and prolong his exploitation of her.

10     104.   Ms. Doe was dependent on Barnett for everything—from rent, to her
11  children's school tuition, to the reimbursement of sex objects he demanded she buy
12  solely for his pleasure.

13     105.   In 2020, Ms. Doe phoned CAA Stellar, after receiving multiple
14  payments from a Stellar Group account, and left a message for CAA Stellar's
15  accountant. Ms. Doe never heard back.

16     106.   Money was no object to Barnett, and he thrived on Ms. Doe's financial
17  dependence. Indeed, even after she escaped in 2024, as detailed more fully below,
18  he wrote her, "I paid to keep you *and let you live*." Ms. Doe believed this statement
19  was a masked death threat.

20  ***After Trafficking Ms. Doe in 2017, Defendant Barnett Controlled All Aspects of***
21  ***Plaintiff's Life—Stalking, Harassing, Raping, and Violently Abusing her.***

22     107.   Barnett was strategic about how he kept Ms. Doe. He kept her close to
23  his office and home, living in plain sight in a safe and desirable neighborhood.

24     108.   Barnett told her, "I expect 100% obedience, nothing less;" "you are to
25  have no thoughts of your own;" and, "[y]our master will break you. Slave will
26  scream and cry [a]nd beg."

27     109.   Ms. Doe obeyed Barnett because she lived in fear of being separated
28  from her children if she did not obey every one of Barnett's instructions.

110.    Barnett stalked Ms. Doe at all hours of the day. He tortured Ms. Doe remotely from his Stellar meetings, his offices, while giving interviews to the press, and during his business travels abroad, including when he was in the United States.

111.    Barnett was regularly in the U.S. for business, including Los Angeles, when negotiating the deals with ICM and CAA and representing numerous CAA Stellar athletes.

112.    Barnett messaged Ms. Doe incessantly, oftentimes hundreds of times in one day, and demanded an immediate response from her. He would punish her if she left him waiting too long for a response. As just one example, he wrote Ms. Doe, "Now you ignore me, I'm furious."

113.    Barnett collected an endless library of illicit material he obtained from Ms. Doe. He demanded she send him videos of herself engaging in degrading acts, including but not limited to: drinking her own urine; licking the toilet with her mouth; eating her own feces; inserting everyday objects into herself; whipping herself as "punishment;" cutting herself to show him blood; and other self-harm. He also insisted she send him videos and pictures of the wounds he left on her body. She remained terrified that Barnett was sharing the explicit material with others or would use the material, later on, to obtain more control over her.

114.    Based on his communications, Ms. Doe was terrified that Barnett was sharing the explicit material with others.

115.    Barnett demanded Ms. Doe send videos of herself doing hundreds of repetitions of exercises, as well as pictures of everything she ate. Some days, he demanded she eat food off the floor, other days he denied her food and water.

116.    Barnett was obsessed with treating her like a dog, kicking her and keeping dog leashes, a dog bone, and heavy collars that he used on her violently.

117.    Barnett had other animal obsessions, including but not limited to, Barnett stripping naked and riding around the room on Ms. Doe's back, forcing her to crawl and telling her she was a pony while he whipped her. The heavy weight of

Barnett on Ms. Doe's back and knees often left her with pain, bruises, and bleeding knees.

118.  Ms. Doe lived in constant fear that he would turn up at any time without notice. Barnett required access to the apartments where he kept Ms. Doe and demanded she leave him a key in the hallway.

119.  Oftentimes after he visited her, Barnett would leave her tied up overnight without food or water, or kneeling on rice, while sending her messages, "I am watching you." Other times, he would make her kneel on rice with her hands tied behind her back, or leave her in other painful positions as he napped, then make her FaceTime him so that he could see her injuries.

120.  For years, Barnett repeatedly raped Ms. Doe, penetrating her vagina, anus and mouth with his penis without her consent.

121.  Barnett punched, kicked, and whipped Ms. Doe. He also forced her to play sadistic games with him where she had to hurt herself. When she cried out in pain, he told her, pain would make her a better slave, and the pain was good for her.

122.  When Barnett visited the apartments where he kept Ms. Doe, oftentimes unannounced, the following occurred, including but not limited to:

       a. forcing Ms. Doe to lick clean with her tongue the soles of his Ferragamo loafers, after stripping off his clothes, revealing his large white underpants, a gold chain, and a long scar on his lower leg;

       b. forcing Ms. Doe to drink his urine, and clean his anus with her tongue;

       c. forcing Ms. Doe to tell him "thank you," as he repeatedly kicked, punched, and hit her vagina with hard objects, resulting in injuries, bruises and swelling;

       d. repeatedly kicking Ms. Doe while she was on the floor. On one occasion, Defendant Barnett kicked Ms. Doe in the ribs 50 times, causing her to faint. She woke up to Barnett pouring a bowl of iced

1    water over her head;

2    e.  forcing Ms. Doe to kneel in front of him, handcuffing her wrists

3        behind back, then demanding she stay in position for long periods

4        of time as she begged him to be released until her knees bled. If she

5        did not beg "genuinely," he would continue to leave her in the

6        position as he relaxed;

7    f.  throwing a bone and making Ms. Doe crawl on her hands and knees

8        to fetch it, over and over until he decided to stop;

9    g.  stomping on her toes and fingers, causing breaks and bruising,

10       punching her head, and pulling her around by her hair and ears;

11   h.  hitting Ms. Doe in the face with an open hand, and grabbing her

12       throat until she fainted, resulting in blood shot eyes and burst

13       capillaries in her face;

14   i.  forcing Ms. Doe to count and say, "thank you, My Master," for

15       each stroke as he beat Ms. Doe with a snake whip and cane, on her

16       thighs, butt, and back until she bled, leaving Ms. Doe with welts

17       and cuts that got infected;

18   j.  bludgeoning her body with a police baton-like object, leaving her

19       skin deeply bruised and covered in red welts;

20   k.  raping her anus with a variety of household objects—including a

21       rolling pin, a metal whisk, and a wooden spoon—and Barnett's foot

22       and shoe, then making Ms. Doe lick the various objects clean with

23       her own feces. This caused Ms. Doe to bleed out of her anus for

24       days and develop ulcers in her mouth. Ironically, Barnett was

25       obsessive about disinfecting and wiping objects clean. Ms. Doe

26       recalls he always had a unique smell as if he sanitized his genitalia

27       before attacking and raping her;

28   l.  raping Ms. Doe with a red petrol funnel which he would urinate

1      into while it was in her. Ms. Doe often cried, screamed, and begged

2      Barnett to stop but he would become more enraged and taunt her

3      with questions such as, "well what are you good for then," and

4      scream that she was "nothing but a stupid whore" and "less than a

5      dog;"

6          m. forcing Ms. Doe to wear a collar around her neck, as well as other

7             tight harness-like objects with spikes underneath her clothing when

8             she was in public or going to sleep.

9      123.   Barnett told Ms. Doe that the markings were to show that she was

10  "owned." Her skin was often infected from the cuts, welts and bleeding. Ms. Doe

11  has pictures of knife marks on her body, whiplashes on her back and buttocks,

12  bruises on her arms and hands, swelling and bruising on her vagina and anus; as

13  well as compound injuries after being abused by Barnett, multiple days a week.

14      124.   To this day, Ms. Doe still has urinary tract infections, skin rashes,

15  mouth ulcers, and bleeds from her vagina in an abnormal way as a result of

16  Barnett's horrific and barbaric torture and abuse.

17      125.   As part of his abuse, Barnett never called Ms. Doe by her name, only

18  "slave," as well as other demeaning words, including but not limited to: "whore;"

19  "slut;" "dog;" and "useless."

20  ***Defendant Barnett Made it Clear That Ms. Doe Worked for Him and "He Was"***

21  ***CAA Stellar.***

22      126.   Ms. Doe's work was nonstop, and it was rigorous. Barnett controlled

23  her basic human rights, her daily decisions, and her movements. Barnett's rules and

24  threats were endless. Barnett ordered Ms. Doe to tell other girls he connected with

25  about his "rules" and "show them." Barnett also used her email to exchange

26  degrading and abusive videos with prostitutes and other "slaves."

27      127.   Barnett consistently referred to what Ms. Doe did as "work," and a

28  "job." When expressing his approval, he would tell her, "Good job." If he wanted

Ms. Doe to return to her duties, he would tell Ms. Doe to "get back to work."

128.   Barnett insisted that Ms. Doe always show she was owned, whether by maintaining markings on her body or by wearing a choker or cuffs, particularly when she was required to introduce "other slaves" to him.

129.   Barnett incessantly required that Ms. Doe create "lists" of ways he could abuse her. If the list was not his liking, he would threaten to beat Ms. Doe, saying her "focus" was not proper, and that "pain would help [Ms. Doe] become a better slave."

130.   Based on the level of control, practice, and calculation that Barnett put into his scheme to break Ms. Doe down into his sex slave while keeping her in plain sight, coupled with the comments Barnett made to Ms. Doe about other slaves, Ms. Doe believes that she is not the first "slave" that Barnett has kept.

131.   As discussed elsewhere herein, Ms. Doe is informed and believes that Barnett applied the same calculated methods of control and manipulation to his clients—many of whom signed with Barnett early in their careers, some not yet 18 when he took control over their lives.

132.   After every occasion that he physically abused Ms. Doe, Barnett demanded she send him photographs and videos of the marks he left on her body *to his company phone.*

133.   Barnett frequently confirmed that Ms. Doe did, indeed, work for him:

    a.   In his numerous written exchanges with her, he said things, including but not limited to, "Slave worked well today;" that she "pleased" him; and, that she "did a good job."

    b.   In 2021, Ms. Doe was wired her salary from a Stellar Group account;

    c.   Barnett wrote Ms. Doe multiple times *from his work email*, referring to her as "slave," and telling her to get back to work;

    d.   Most of Barnett's in-person torture and assaults of Ms. Doe was

1     during work hours, with Barnett acting as though a normal day of
2     work for him included sadistic torture of his sex slave.

3     134.   Ms. Doe explicitly told Barnett she was "frightened," "scared," and
4     "this does not sit well with me," but he always ignored her.

5     135.   As part of her job, Barnett required Ms. Doe search for and purchase
6     objects and equipment for him to abuse Ms. Doe and other women with, including
7     but not limited to: whips; a rolling pin; a petrol funnel; a dog bone; a horse
8     headdress with mouth bit; zip ties; candles; dog leads with heavy chains; metal
9     clamps; rope; padded gloves; padded handcuffs; a medical vaginal inspection
10    device; large rubber plugs; a rubber prosthetic arm; lingerie; extremely high plastic
11    high heels; a blindfold; locks and hooks; a knife; a pastry cutting wheel device;
12    chains; a baton; restrictive garments; rope; and other debilitating devices.

13    136.   Barnett was particularly interested in devices that were debilitating,
14    caused marks, cut the skin, and caused bleeding. If the marks that Barnett inflicted
15    during his in-person visits faded before his next in-person visit, Barnett would order
16    Ms. Doe engage in self harm so that she was remarked. Barnett would require
17    videos of Ms. Doe engaging in self-harm or require that it be done under his
18    supervision via FaceTime.

19    137.   Barnett required Ms. Doe to get plastic surgery to be more appealing to
20    him and to remedy the injuries caused by his violent abuse. Yet, as her body healed
21    from the surgeries, he made her look for other slaves, under the threat of further
22    physical abuse. On one occasion, when Ms. Doe failed to deliver images of girls to
23    him and was slow to respond, he clamped her vagina closed, injuring Ms. Doe so
24    badly that she needed reconstructive surgery of her labia.

25    138.   Ms. Doe was to be available to Barnett around the clock and respond
26    to him immediately. If she did not, he would send her abusive messages such as,
27    "How dare you keep your Master waiting," and torture Ms. Doe sadistically as her
28    penance for this misdeed. Any delay in responding to him, even for a few minutes,

1  would incur additional "punishments," when he next "trained" Ms. Doe, or she

2  would have to "do something to show how sorry she is."

3  ***Defendant Barnett Required Plaintiff to Participate in "Slave Hunting."***

4      139.  Barnett insisted that Ms. Doe always show she was owned, whether by

5  maintaining markings on her body or by wearing a choker or cuffs, particularly

6  when she was required to introduce "other slaves" to him.

7      140.  After approximately two months of violent abuse by Barnett, he

8  ordered Ms. Doe to participate in an all-consuming task that he called "slave

9  hunting."

10      141.  When Barnett initially explained her duties to her, she objected. In

11  response, he said, "Think of it as a game like football."

12          a.  First, Barnett provided Ms. Doe with sex sites where she was

13             required to set up profiles.

14          b.  Next, she was to search for women on the sites who fit Barnett's

15             specific requirements: young, no tattoos, tall, nice face, someone

16             "prepared to take the whip," submissive, pretty, good body.

17          c.  Then, she had to send him explicit images of the women and obtain

18             his approval. If the images were not explicit enough, Barnett would

19             insist on naked pictures of the women so he could "see their body."

20          d.  If a woman was of interest to him, Ms. Doe had to contact the

21             woman on his behalf, arrange to meet with them, and/or arrange for

22             them to meet with Barnett at a hotel/room rental.

23          e.  Ms. Doe was responsible for all communications, for arranging the

24             meet-up, and for securing the rooms at luxury hotels like the

25             Churchill and the Millenium Hotel Mayfair, as well as booking

26             Airbnb apartments.

27          f.  Barnett required Ms. Doe to "prepare" the women for meeting

28             Barnett, otherwise he would "punish" both the woman and Ms.

1        Doe.

2        g.  Barnett also had rules of engagement; Ms. Doe was required to

3             "work with" the new "slave" before the meet-up.

4        h.  Barnett required Ms. Doe arrange for his meetings with the

5             "slaves," where beforehand she had to "prepare" them for meeting

6             him. Ms. Doe recalls one occasion where he demanded that he

7             shave a girl down and "tell her the rules." Ms. Doe did not do this,

8             and the meeting never occurred.

9        i.  Ms. Doe was further responsible for receiving and writing emails

10            on his behalf, receiving and holding cash to pay the women he met,

11            purchasing specific equipment and devices, and requiring that the

12            women be "dressed in your likeness."

13       142.   Early on, Ms. Doe developed a narrative of excuses she told Barnett to

14  divert the women from meeting Barnett. Often, this would result in more severe

15  beatings for Ms. Doe if Barnett thought she had failed to recruit new slaves.

16       143.   In the hotel rooms and Airbnb locations, Barnett also forced Ms. Doe

17  to have sex with prostitutes while he would beat her and masturbate.

18       144.   During these escapades, he attempted to lure the other women into his

19  slavery scheme by offering to pay them 4,000 pounds/month, and asking if they

20  "trained," just as he asked Ms. Doe during their lunch meeting at George. When the

21  women objected, he would laugh at them and pretend he was just kidding.

22       145.   On a number of occasions, Ms. Doe recalls sex workers running from

23  the rooms and establishments after witnessing Barnett abuse her, saying, "nobody is

24  going to do that to me." On one occasion, this occurred at a brothel only steps away

25  from his house in London.

26       146.   Barnett kept large amounts of cash at various apartments, which

27  Barnett ordered Ms. Doe to use to pay for sex workers, and which he used to try

28  and lure other women to become his sex slaves.

147.   Upon information and belief, Barnett paid a prostitute 50,000 pounds for her silence after he learned that she had recorded a video of him beating Ms. Doe. Upon information and belief, that woman is a real estate agent living in Dubai.

148.   Other times, he used Ms. Doe's email account and online profiles to communicate with prostitutes. Specifically, he used Ms. Doe's email address to receive videos from another prostitute who recorded herself giving him "servitude" while chained to a toilet. This young woman once emailed Ms. Doe, saying Barnett caused her excessive pain beyond her boundaries.

149.   On or about September 2018, Barnett demanded Ms. Doe engage in "slave hunting" for him while she was in Los Angeles. During this time, Barnett tormented her endlessly, stalking her every move, and relentlessly inquiring into whether she found him a "new slave."

150.   Upon her return to London, Ms. Doe went through her litany of prepared reasons for not finding Barnett a "new slave" while she was in California.

151.   On or about April 2020, Barnett instructed Ms. Doe to find him a "young, black slave," who he would pay 4,000 pounds/month in exchange for him being able to whip, cane, and sexually abuse her.

152.   Oftentimes, when Ms. Doe failed to find Barnett a "new slave," he would beat, bludgeon, and whip her naked body the next time he came to the apartment because she was "failing" him.

***Plaintiff lived like a caged animal, answerable at all hours to Defendant Barnett's sadistic requests and insatiable obsession to control and hurt her.***

153.   When Barnett was not physically with Ms. Doe, he was remotely abusing her. Barnett abused her while he was away on work trips throughout the United States (including in Los Angeles), and around the globe. For example, in November 2017, as he was in Florida giving an interview to the *New York Times*, while also remotely abusing Ms. Doe.

154.   Barnett required Ms. Doe to install a hook in the ceiling of the

1  apartment where he kept her, for him to use to tie Ms. Doe up, as well as other

2  women.

3      155.   Barnett introduced Ms. Doe to online retailers that were previously

4  unknown to her to facilitate his demands in her job. He ordered Ms. Doe to create a

5  profile on a "BDSM, fetish and kinky sex site" called fetish.com – he explained to

6  her that he was "the S – sadist," told her of a site called DayUse.com to use for

7  hotel bookings; and, UberKinky.com for Ms. Doe to purchase specific kinds of

8  equipment and objects for Barnett to cause severe pain to her and others. Barnett

9  also took Ms. Doe to sex dungeons.

10      156.   Every morning and night Barnett forced Ms. Doe to send him

11  "servitude," whereby she was required to FaceTime him, or send him sexually

12  explicit content, including but not limited to videos of herself kneeling and bowing

13  to him, naked and wearing high heels, with metal clamps on her vagina and nipples.

14  She had to lick and kiss the floor, while saying over and over, "I am My Master's

15  slave to do with as he wishes." If she did not send the videos of herself to him

16  within an expected timeframe, he would accuse her of being late and punish her.

17      157.   When Barnett ordered her to show him more respect, Ms. Doe had to

18  get on her knees and give thanks repeatedly to Barnett—training Ms. Doe to say,

19  "thank you for being My Master today."

20      158.   During the holiday season, he was particularly ruthless and

21  demanding. On one occasion, while he was in Miami with his family, he permitted

22  Ms. Doe to see her family for Christmas, yet he still had complete control over her,

23  telling her, "go somewhere and taking a form of whip lash your pussy as hard as

24  possible 30 times now."

25      159.   Despite publicly professing his devoutness to his religion, he insisted

26  on Ms. Doe sending him videos of servitude and self-harm during times that he was

27  supposed to be engaging in a day of rest and spiritual enrichment.

28      160.   Barnett constantly threatened Ms. Doe that if she tried to leave or if

she upset him that he would seek revenge in the following ways, including but not limited to: hurting the future prospects of her children; putting Ms. Doe in prison; making her "penniless;" and ensuring that she would never find work again.

161.   Barnett even told Ms. Doe that he sought the advice of a member of the prestigious "King's Counsel," who told him that his conduct was not illegal.

162.   Barnett reduced Ms. Doe to a shell of herself. "Humiliation is good for slave.  It helps her know her place and focus the mind," he wrote Ms. Doe.

163.    Isolated from reality, Ms. Doe lost all sense of her self-worth. Ms. Doe frequently saw Jonathan Barnett glorified in the press, and only felt more hopeless when he was quoted using phrases like "kick it out," "on their knees," and fans should "kiss the ground."

164.   Barnett frequently threatened Ms. Doe that he would pimp her out to other men. Early on, he threatened, "If you make another mistake, I may make you suck 2 other men's cocks together."

165.   Barnett often sent her pictures of his flaccid penis demanding that she arouse him.  Barnett was only aroused by extreme violence and/or degrading acts.

166.   Sometimes, after visiting her, Barnett would leave Ms. Doe tied up, naked, and without water or food until he returned the next day. Barnett told her this was part of her "training, to teach her a lesson."

167.   Ms. Doe was only able to sleep in her bed with Barnett's permission or as a reward for obeying him. As one example, at night, Barnett required that Ms. Doe drink her own urine, and sleep on the floor chained to the toilet.

168.   On one occasion, Ms. Doe was bleeding from her vagina after Barnett had injured her. Barnett ordered her to urinate and drink the bloodied water in a video to him. Ms. Doe completed the task, knowing that Barnett would torment her until she did and that he would not leave her alone, to rest and try to heal, unless she satiated his barbaric requests.

169.   To endure his horrific abuse, Ms. Doe disassociated from herself and

1    from her life. Her days turned into months, and her months turned into years.

2        170.    Illness, medical procedures and injuries became the norm in her life.

3        171.    Ms. Doe lived in fear that Barnett would eventually kill her in one way

4    or another. She became dependent on painkillers to numb the physical pain from

5    the compound injuries he inflicted upon her, and sleeping pills to help her sleep

6    through nightmares and physical pain.

7        172.    During the COVID-19 lockdown, which began in early 2020, Ms. Doe

8    initially hoped she would be able to escape from Barnett. Instead, his demands and

9    control over her became worse and all-consuming. Despite not seeing her in person,

10    Barnett ensured that he abused her remotely while he stayed at home.

11    ***Defendant CAA Stellar employees, agents, and emissaries assisted Defendant***

12    ***Barnett in the sex trafficking and forced labor scheme.***

13        173.    Ms. Doe was not Barnett's secret lover or mistress, but rather a servant

14    to Barnett, facilitated by CAA Stellar agents and employees who assisted him in

15    this six-year scheme.

16        174.    At Barnett's instruction, BSG Valentine and CAA Stellar associates

17    assisted with leases for Ms. Doe and visas for her minor children. Barnett, however,

18    refused to assist Ms. Doe with a visa, using her presence in the U.K. as a tool to

19    maintain control over her and her children.

20        175.    CAA Stellar Assistant Gina Mazzarelli also assisted Barnett in

21    facilitating Ms. Doe's living and financial arrangements. Ms. Mazzarelli delivered

22    money to the apartments where Barnett kept Ms. Doe during her work hours.

23    Oftentimes, the envelopes explicitly had "from Gina," handwritten on the front.

24        176.    To keep Ms. Doe afraid for her safety, Barnett told her that his drivers

25    and bodyguards also served as his lookouts.

26        177.    During the workday, CAA Stellar drivers drove Barnett in the

27    company car to the apartments where Ms. Doe was housed, and waited outside for

28    him, oftentimes for hours at a time, multiple days of the week and during work

1    hours.

2       178.   During the workday, Stellar drivers drove Barnett to the apartments

3    where he kept her and waited for him while he beat and raped her.

4       179.   Ms. Doe was also afraid of CAA Stellar employees and agents as they

5    facilitated her enslavement and had access to her leases, bank accounts, and

6    children.

7       180.   Barnett often sent her a picture of his face saying, "I am watching

8    you." Barnett also told Ms. Doe that people within the Stellar Group were watching

9    her, including his drivers who knew where she lived.

10      181.   On information and belief, Barnett offered to assist Ms. Doe's child,

11   Child 1, with employment and housing expenses in South Korea with the plan to

12   groom Child 1 into sex trafficking.

13   ***Defendant Barnett brings such a high value to Stellar Group Defendants'***

14   ***business and brand that the Stellar Group Defendants knowingly facilitated***

15   ***Barnett's depraved actions.***

16      182.   CAA Stellar, Stellar Limited, and Barnett formed a mutually beneficial

17   venture that facilitated Barnett's depraved activities in exchange for the financial

18   windfalls that Barnett brought the Stellar Group and its affiliates.

19      183.   Defendant CAA Stellar and its alter ego Defendant Stellar Limited

20   benefitted financially from Defendant Barnett, so it was in the Stellar Group's best

21   interests to assist Barnett.

22      184.   Moreover, the fallout if it were to be discovered that Barnett recruited

23   sex slaves under the auspices of working at CAA Stellar and used the Stellar

24   Group's funds to pay for commercial sex acts, would be immense. This was

25   especially true in the 2019–2022 period in which two of the largest talent agencies

26   were considering, and eventually agreed to, lucrative business deals with CAA

27   Stellar.

28      185.   Barnett gave Ms. Doe one of his business cards that read, "Executive

1  Chairman of Stellar Group" to use while hunting for new slaves. Ms. Doe still has
2  one of these business cards in her possession.

3  186.   In October 2019, Barnett earned *Forbes'* top spot as the "Most
4  Powerful Agent in the World," as a result of having negotiated more than $1.28
5  billion in active contracts and transfers fees, with his maximum possible
6  commissions exceeding $128 million, and a client list that included hundreds of
7  athletes, including soccer stars Saúl Ñíguez, Gareth Bale, and Ben Chilwell.

8  187.   Shortly thereafter, in late 2019, Chris Silbermann, the CEO of ICM
9  Partners talent agency, headquartered in Los Angeles, contacted Barnett after
10 hearing that Barnett was interested in selling CAA Stellar.

11 188.   In December 2019, Silbermann met Barnett in Miami, Florida. By the
12 end of this initial meeting, Barnett had convinced Silbermann to buy CAA Stellar
13 and all its entities and affiliates, including but not limited to Stellar Limited.

14 189.   Throughout 2020, while Defendants Stellar Group and ICM were
15 negotiating this deal, the Stellar Group Defendants wired money to Ms. Doe.
16 Specifically, £5000 on January 2020, £5,900 on July 31, 2020, and £9500 on
17 September 7, 2020.

18 190.   On or around October 2020, ICM purchased CAA Stellar and all its
19 affiliated entities for an undisclosed amount.

20 191.   Upon information and belief, at the time of ICM's acquisition,
21 Barnett's long-time attorney, Defendant Barnett, and Manasseh were CAA Stellar's
22 sole shareholders.

23 ***Defendant Rebrands from the Stellar Group to ICM Stellar Sports.***

24 192.   On or about October 27, 2020, ICM officially renamed CAA Stellar
25 from the "Stellar Group Limited" to "ICM Stellar Sports Limited." Upon
26 information and belief, the CAA Stellar company structure remained the same.

27 193.   Upon information and belief, Barnett became the Executive Director
28 of ICM Stellar and signed a long-term employment contract with ICM.

1    194.   Following the acquisition, several Los-Angeles-based ICM executives

2  joined the new ICM Stellar board of directors: Theodore Chervin, Richard Levy,

3  Jonathan Perelman, and Steven Stanford.

4    195.   Upon information and belief, the California-based Perelman was

5  named President of the new ICM Stellar Sports

6    196.   Upon information and belief, California-based Chervin was named

7  Chairman, and was responsible for adding "oversight of the ICM Sports business to

8  his wide-ranging purview at ICM with a mandate to build it, especially in North

9  America."

10    197.   The Stellar board of directors, now primarily located in Los Angeles,

11  was responsible for, among other things, "keeping adequate accounting records, and

12  taking reasonable steps for the prevention and detection of fraud and other

13  irregularities," as stated in CAA Stellar's publicly filed yearly financial statements.

14    198.   In an interview with the *New York Times* about ICM's purchase of

15  CAA Stellar, Silbermann was specifically asked about corruption in soccer. In

16  response, Silbermann said he "thought about the risks of getting involved in soccer

17  'for a long time' before deciding that ICM had found, in Stellar's founders Barnett

18  and Manasseh, partners it could trust."

19    199.   Stellar then launched a new website – icmstellar.com – and posted the

20  following Modern Slavery Statement:

> Modern slavery is a crime and a violation of fundamental human rights. It takes various forms, such as slavery, servitude, forced and compulsory labour and human trafficking, all of which have in common the deprivation of a person's liberty by another in order to exploit them for personal or commercial gain. ICM Stellar Sports condemns slavery in all its forms, and we commit ourselves to zero tolerance of all forms of slavery and human trafficking . . . **ICM Stellar Sports commits itself to acting ethically and with integrity and transparency in all of its business dealings and relationships and to ensure that modern slavery and human trafficking are not taking place anywhere within either our business or in any of partners or suppliers**. We also commit ICM Stellar Sports to remain consistent with its obligations under the Modern Slavery Act 2015.

200.   During this time, the accounting firm BSG Valentine continued to audit all Stellar Groups' statements filed with the U.K. Government.

201.   At all relevant times herein, Defendant Barnett continued to use his company-owned email address to communicate his orders to Ms. Doe, using language that would have been a red flag to a corporation that "ensure[s] modern slavery and human trafficking is not taking place anywhere within its business." For example, in February 2021, Barnett emailed Ms. Doe, *via his company email*, "Let your master know when slave is ready back in position. Slave will not be allowed to camas *[sic]* punishment."

202.   Around this time, Barnett appointed two of his sons to leadership roles, one of those roles being Head of Technology. Ms. Doe felt more powerless to speak out than ever. She considered taking her life on many occasions as she struggled with her addictions and the pain from her compounded injuries.

203.   In early 2021, Ms. Doe began to develop a tumor on her back, located where Barnett violently kicked her repeatedly and beat her with whips, canes, and other blunt force objects.

204.   In May 2021, ICM came under fire for its treatment of women when a *Los Angeles Times* investigation alleged that more than 30 former and current ICM employees claimed the agency "tolerated a hostile work environment, where women and people of color were subjected to harassment, bullying and other inappropriate conduct. Since 2017, nearly a dozen women reported allegations of mistreatment by male agents and managers companywide to ICM Partners' human resources department or senior leaders." Further, three female ICM board members told the LA Times that CEO Chris Silbermann's "50/50 by 2020" pledge, that followed the Weinstein exposé by the *New York Times*, was an "insincere marketing ploy."

***The Regis & Stoute Lawsuit Reveals Defendants' Disturbing Pattern of Coercive Control and Unsavory Business Practices.***

205.   Ms. Doe did not know then but now knows that, on or about October 29, 2021, CAA Stellar subsidiary, Stellar Athletics LLP, filed suit against its former partners John Regis and Jennifer Stoute after they left the Stellar Athletics and opened their own talent agency.

206.   Upon information and belief, Stellar Athletics' lawsuit attempted to legitimize the Stellar Group's debt bondage over its only two Black partners who left the company after learning Barnett sold CAA Stellar to ICM without giving them a cut, despite his prior assurances to the contrary.

207.   Ms. Doe did not know then but now knows, on April 11, 2022, Stoute and Regis filed a responsive pleading to Stellar Athletics' suit that revealed the following, including but not limited to:

      a.  That the Stellar Group engaged in "pervasive" financial misconduct;

      b.  That Barnett promised to pay Regis and Stoute at a later date;

      c.  That Barnet insisted BSG Valentine prepare their tax returns rather than allow them to prepare their returns independently;

      d.  That the Stellar Group had an in-house accountant who closely monitored the businesses' expenses and books

      e.  That Stoute and Regis were told that they were working off of "debts";

      f.  That CAA Stellar had been accused of tax evasion orchestrated by Barnett and/or the BSG Valentine accountant Melvin Ganz;

      g.  That Barnett allegedly "paid off" Mr. Ganz for cleaning up Stellar Group's tax issues;

      h.  That Barnett would boast about "looking after his staff" which included Regis and Stoute, and that he was funding their children's education.

***Plaintiff Begs Defendant Barnett to Set Her Free and Relies on Barnett's False***

1    ***Promises for a Year at Great Expense to Her Physical Health and Wellbeing.***

2        208.    On November 11, 2021, Barnett told Ms. Doe to "shut up" after she

3    asked him for money, and said he was in the U.S. on business. Barnett subsequently

4    arranged for a payment while he was in the United States.

5        209.    On or about December 9, 2021, Ms. Doe messaged Barnett, "We need

6    to resolve my situation so I am no longer reliant on you. There's too much that does

7    not sit well with me and I need to get on and get healthy."

8        210.    Also on or about December 9, 2021, Ms. Doe finally gained the

9    courage to confront Barnett at his home. She decided to drive to his house with his

10   bag of sex objects that he used to torture her and leave them on his doorstep. When

11   she arrived, and to her surprise, Barnett was standing in front of the home near a

12   CAA Stellar car and driver. Ms. Doe pulled up next to the car and signaled for the

13   driver to come to her window. Upon his approach, she proceeded to tell him, "I

14   don't know about you, but he has me trapped as a slave." She then handed him the

15   bag of sex objects and said, "This is for Jonathan Barnett."

16       211.    Upon seeing Ms. Doe, Barnett approached the car, leaned into the

17   passenger side window, and said something to the effect of, "I will smash your face

18   in and break your legs if you ever speak of this again. Don't think you'll be safe if

19   you go home."

20       212.    Ms. Doe then proceeded to drive home where Barnett called her,

21   offering her $30,000 for resolution, which she refused.

22       213.    Barnett suddenly became increasingly communicative in his desire for

23   a quick resolution.  At approximately 11:30 am, on December 22, 2021, Barnett

24   messaged Ms. Doe, "Cannot believe you. Do you really think I am stalling you."

25   Barnett then informed Ms. Doe that his lawyer returned the week of January 1,

26   2022, and he would send such an "agreement."

27       214.    Several hours later, Barnett told Ms. Doe that his lawyer "is Graham

28   Shear and he will draw something up in case anything happens to me."

215.   Graham Shear was a shareholder of CAA Stellar, as well as of Stellar Limited, and was also the lawyer for at least one of CAA Stellar's athletes, including Ashley Cole during the aforementioned 2005 conspiracy/hotel-meeting with Chelsea F.C.

216.   In response, Ms. Doe said to Barnett, "[a] person like me becomes entrapped because they can't use corporate and personal lawyers at the level you can. I've said I will wait till January...You've made me wait and wait....you want to keep moving the goalposts...you create more anxiety for me by delaying when I've been through enough."

217.   Around Christmas 2021, Barnett told Ms. Doe that he was "still in trouble with the tax man," and pressured her to accept the £30,000.00.

218.   Meanwhile, CAA Stellar, true to form, held a holiday party at a bondage club where a female guest crawled on the floor in a skirt, in the presence of male members of CAA Stellar. Mazzarelli posted these pictures on social media.

219.   On December 28, 2021, Ms. Doe begged Barnett for resolution, stating, ". . .it's gone on for too long and I'm scared every day."

220.   January 1, 2022, passed with no call from Mr. Shear or anyone else with respect to Barnett's promised settlement.

221.   On or around January 11, 2022, when Ms. Doe pushed Barnett to keep his promise and draw up said agreement, which he repeatedly told her that he would do and she was to agree to, he wrote ". . .if you ever threaten me again I will stop everything and you may ruin me but you will be penny less *[sic]* so stop it now I cannot believe how you have suddenly started being so cruel . . . I will draw up everything legally to protect you . . ."

222.   Barnett then told Ms. Doe to "pick a day next week" to meet him in person. Ms. Doe questioned him, "How can I feel safe after the last time when you threatened me," referring to the abovementioned December 9 incident. In response, Barnett said he wanted to "have a nice chat and remain friends." Afraid for her

1    safety, Ms. Doe refused to meet with Barnett alone.

2    ***In Order to Keep Plaintiff Silent During the CAA-ICM Merger, Defendants***

3    ***Threaten Plaintiff's Child to Ensure Her Compliance.***

4        223.    In March 2022, Ms. Doe told Barnett, "Feels like I'm being mucked

5    around again." He shot back at her, exerting his coercive control, "Stop being an

6    idiot. Everything is being dealt with and going ok. If you carry on as you are you

7    will ruin it for [Child 1]."

8        224.    Child 1 was working in South Korea and Barnett injected himself into

9    managing the Child 1's financial affairs to ensure Ms. Doe's compliance.

10       225.    Upon information and belief, it was Barnett's intent to also coerce

11   Child 1 into sex trafficking and/or forced labor once she became financially reliant

12   on him and trapped in a foreign country.

13       226.    Rather than set Ms. Doe free, Barnett instead chose to pay for Child

14   1's living arrangements in South Korea for an entire year to maintain his control

15   over Ms. Doe and ensure her silence during his crucial negotiations with Defendant

16   CAA.

17       227.    CAA Stellar was complicit in this and facilitated Child 1's work visa

18   arrangement, transportation, and housing.

19       228.    On or about April 2, 2022, Barnett directed Kevin Jang, Managing

20   Director of ICM Stellar Korea, and James Park, also from Stellar Korea, to wire

21   £70,000 from a CAA Stellar account to Child 1's landlord in South Korea. Barnett

22   told Ms. Doe that he moved money through the Stellar Germany office to the

23   Stellar Korea office to facilitate the arrangement, and that she would have an

24   "account" to pay him back. Barnett knew Ms. Doe was not able to pay him back, as

25   she was living with chronic injury, without family support, and without any

26   financial means other than what Barnett gave to her to spend on his slavery scheme.

27       229.    Upon information and belief, Barnett further directed Stellar Korea, in

28   his scope of authority as executive director of CAA Stellar, to obtain a visa for

1  Child 1 by falsely claiming she was an employee of a company named Blue Stage.

2      230.   In May 2022, Barnett threatened Ms. Doe, as she begged him for

3  money and for a final resolution, which he refused to provide.

4  ***Defendant CAA Merges with ICM and its Subsidiaries, Including the Stellar***

5  ***Group Defendants and Other Stellar Entities.***

6      231.   In or around June 2022, pursuant to Delaware law, Defendant CAA

7  Entities, also headquartered in Los Angeles, merged with ICM Partners, including

8  all its affiliates and subsidiaries for $750 million.  On or about June 28, 2022,

9  Defendant CAA Holdings, as the surviving entity, filed a certificate of merger with

10  the Delaware Secretary of State. As a result of the statutory merger, all debts and

11  liabilities that may be enforced against ICM became enforceable against the

12  Defendant CAA Holdings as the survivor entity to the merger.

13      232.   On information and belief, after the CAA-ICM Merger, there was a

14  continuity of management, personnel, physical location, assets and general business

15  operations of ICM Partners as a part of CAA Entities.

16      233.   Prior to finalizing the CAA-ICM Merger, CAA Entities had public

17  information regarding Stellar Groups' fraudulent and illegal practices, dating back

18  to 2005. CAA Entities even used BSG Valentine to audit the new CAA-ICM Stellar

19  deal despite the allegations from former Stellar Athletics partners Stoute and Regis

20  in their public lawsuit.

21      234.   On or about July 14, 2023 CAA Stellar was renamed once again, to its

22  current name, "CAA Stellar Sports Limited." The controlling entity of CAA Stellar

23  became CAA Holdings.

24      235.   ICM's California-based team—Perelman, Stanford, and Chervin—

25  remained on the new CAA Stellar board after the CAA-ICM Merger, and CAA

26  Stellar's board of directors subsequently remained based in Los Angeles.

27      236.   Upon information and belief, following the CAA-ICM Merger, ICM

28  executives became shareholders and directors of CAA Entities.

237.   After the CAA-ICM Merger, CAA became the undisputed, world leader in sports and entertainment, with the CAA Stellar adding 800 clients with contracts totaling nearly £2.5 billion to CAA's net worth.

238.   On May 4, 2023, CAA posted on its website a "Modern Slavery and Human Trafficking Statement," stating, in part: "No concerns about modern slavery or human trafficking have come up to the knowledge of the Directors of the Group, then raised at any time in the year under review."

239.   At this time CAA knew or should have known that one of its very own Directors—Jonathan Barnett—was not only actively keeping a sex slave but that numerous individuals and entities within the CAA Entities' organization were facilitating the arrangement.

240.   The statement further represented that the Group had taken steps "to ensure that slavery and human trafficking is not taking place in our supply chains or in any part of our business."

241.   On information and belief, "the Group" had not taken any "steps" to ensure slavery and human trafficking were not taking place in any part of its business—as Barnett was openly keeping a sex slave.

***Plaintiff's Health Deteriorates But Defendants Barnett and Stellar Group Still Hold Her in Financial Bondage.***

242.   On June 19, 2022, Barnett messaged Ms. Doe: "You could of still been my slave."

243.   At the time she received this message, Ms. Doe was living in a rented room, so that Barnett no longer knew where she lived. She continued to refuse to see him despite his constant requests. Still, however, she had to send him "servitude" every morning and evening.

244.   Barnett and CAA Stellar continued to regularly conduct business in California, which included placing their clients with California Sports teams. As just one example, in June 2022, Gareth Bale signed with the Los Angeles F.C.

1   Stellar has numerus other professional players in Los Angeles and throughout

2   California as well.

3       245.   On July 13, 2022, Barnett messaged Ms. Doe that he would send her

4   money, but it would, "Come off your account." This is the exact language he used

5   towards Stoute and Regis, his former partners whom he sued after they left Stellar

6   Athletics upon learning that he sold the Stellar Group to ICM behind their backs.

7       246.   In October 2022, Ms. Doe obtained an MRI of the growing lump on

8   her back.

9       247.   In February 2023, Barnett told Ms. Doe he was "in financial trouble . .

10  . I cannot carry on. If we can agree to a reasonable settlement I will borrow it."

11  Despite his response, no settlement agreement appeared.

12      248.   Ms. Doe continued to respond to Barnett in a cordial manner, telling

13  him "good night" and "good morning," in hopes that he would finally decide to

14  settle with her, as he traveled to Los Angeles to work with "the company that owns

15  Stellar."

16      249.   In 2023, her medical history was investigated and documented where

17  she told doctors she was violently abused for years.

18      250.   On or about March 30, 2023, Ms. Doe met with doctors regarding the

19  growing lump on her back. Afraid to tell the doctor that she was living as a slave

20  who had been beaten repeatedly, she said her "partner" physically assaulted her in

21  the late summer of 2022. Her case was expedited, and she was referred to

22  specialists.

23      251.   On April 25, 2023, Ms. Doe obtained a soft tissue biopsy at

24  Kensington Park Medical Centre, of the growing, 8 cm lump on her mid-back. The

25  results determined that she needed to urgently be referred to a specialist for further

26  testing.

27      252.   Ms. Doe called CAA Stellar's offices multiple times, only to be told

28  by Stellar's secretary that there was nobody for her to speak to. She even asked to

speak to Manasseh, whom she knew from decades earlier, but he never called her back.

253.   Ms. Doe also called and asked for someone in accounting to call her to provide her with tax documents for the Stellar Group wires.

254.   On May 4, 2023, CAA posted on its website another "Modern Slavery and Human Trafficking Statement," stating, in part: "**No concerns about modern slavery or human trafficking have come up to the knowledge of the Directors of the Group, then raised at any time in the year under review.**"

255.   In August 2023, Ms. Doe obtained an MRI and subsequently a biopsy in Australia. In September 2023, Ms. Doe started chemotherapy.

***Defendant CAA Cleans House After Definitively Learning About Plaintiff and the Actions of Defendants Barnett, CAA Stellar and Stellar Limited.***

256.   Upon information and belief, CAA was contacted by members of the media, in late January 2024, inquiring into Barnett's conduct towards Ms. Doe.

257.   On February 8, 2024, in an effort to control his public image, Defendant CAA permitted Barnett to put out a public statement, condemning racism in soccer.

258.   Upon information and belief, on or about February 20, 2024, CAA Stellar secretly passed a "special resolution," after which Barnett quietly resigns from the Board of Directors. Neither of these documents were publicly filed at the time.

259.   On or about February 20, 2024, Barnett resigned as Chairman of CAA Stellar. On or about this same time, Barnett also quietly resigned as director and/or officer of all CAA Stellar's subsidiaries and affiliates, including Stellar Limited.

260.   On or about February 26, 2024, Perelman and Stanford resigned as Directors of CAA Stellar. One day later, Chervin also resigned as a director of CAA Stellar.

261.   On or about the end of February 2024, most of the former ICM

executives quietly resigned as directors from CAA Stellar and its related subsidiaries and affiliates, including Stellar Limited. They did not publicly file their resignations until nearly one month later.

262.   CAA then shut down the CAA Stellar websites. When the websites were relaunched several weeks later, all mention of Barnett was scrubbed.

263.   On March 2, 2024, *The Sun* – Britain's largest selling newspaper - "exclusively announced" that Barnett was "set to retire," after an alleged "recent family incident left him contemplating his future."

264.   Before Barnett's "resignation" CAA Entities and CAA Stellar then cemented Barnett's children in leadership positions.

265.   In letting Barnett "resign," Defendant CAA Entities were able to keep and benefit from the value that Barnett and CAA Stellar brought.

### ***Despite her Escape, Plaintiff Continues to Live in Fear and Suffer***

266.   Ms. Doe has not been able to return to normal life since her escape from Barnett. After supporting her children's relocation to new countries, Ms. Doe herself lives in isolation and fear based on Barnett's repeated threats to her and her children.

267.   To date, Ms. Doe undergone three rounds of chemotherapy and is being considered for further procedures to assist her with the desmoid tumor, which is a chronic condition, as a result of Barnett's abuse and torture, and blunt force trauma to her back.

268.   Throughout all of this, Ms. Doe has also participated in lengthy interviews and the exhaustive invasion of what little privacy that she has left by the involvement of law enforcement, including the London Metropolitan Police Department.

269.   The injuries stated herein are permanent in character, and Ms. Doe will continue to suffer pain and distress from the injuries for the balance of her natural life.

270.   Ms. Doe will prove at trial that she will need lifelong treatment because of the pain and suffering inflicted upon her by Defendants.

## FIRST CLAIM FOR RELIEF

### Violation of the TVPRA, 18 U.S.C. §§ 1589(a), 1591(a)(1), 1595

### Against Defendant Barnett

271.   Ms. Doe realleges and incorporates by reference all prior Paragraphs as if fully set forth herein.

272.   Ms. Doe is authorized to bring this civil claim against Defendant Barnett for his actions in the United States, and abroad, pursuant to the civil remedies provision of § 1595(a).

273.   Ms. Doe is a victim of forced labor and human trafficking in violation of Section 1589(a) as Barnett obtained Ms. Doe's labor and services through the following methods of coercion: (1) force, threats of force, physical restraint, or threats of physical restraint to Ms. Doe; (2) serious harm or threats of serious harm to Ms. Doe and her children; (3) the abuse or threatened abuse of law or legal process; and (4) any numerous schemes, plans, and patterns that caused Ms. Doe to believe that, if she did not perform the requested labor and services to Barnett, Ms. Doe would suffer serious harm and physical restraint. *See* 18 U.S.C. § 1589(a)(1)–(4).

274.   Barnett coerced Ms. Does's labor and services through extreme sexual violence, serious harm and threats to cause serious harm to Ms. Doe's person and her children, threats to Ms. Doe that he would get her put in prison, make her penniless, and irreparable damage the future prospects of Ms. Doe's children.

275.   Barnett engaged in violations of threats, coercion, and other acts specified under Section 1589 while he was in the United States and in Los Angeles, in order to force Ms. Doe's compliance with the forced servitude.

276.   Barnett, knowingly, and in interstate or foreign commerce, recruited, enticed, harbored, and transported Ms. Doe, knowing that he was using means of

1  force, threats of force, fraud, and all combinations of all such means therein, to

2  cause Ms. Doe to engage in commercial sex acts. *See* 18 U.S.C. § 1591(a)(1).

3      277.   Barnett knowingly obtained Ms. Doe's labor and commercial sexual

4  services, in interstate and foreign commerce, through force, coercion, threats of

5  violence, extreme and sadistic abuse, and threats to the lives of her children.

6      278.   Barnett sent Ms. Doe to "hunt" for additional sex slaves in Los

7  Angeles, California—thereby knowingly attempting to obtain commercial sex

8  services through threats of force, in interstate and foreign commerce, from women

9  in Los Angeles.

10     279.   Throughout the six years that Ms. Doe was Barnett's slave, Barnett's

11 conduct caused her to believe that if she did not perform labor and services for him,

12 whenever requested, she would suffer serious harm and physical restraint.

13     280.   Ms. Doe's work was nonstop, and it was rigorous. Barnett controlled

14 her basic human rights, her daily decisions, and her movements. Barnett's rules and

15 threats were endless.

16     281.   Barnett is liable for his violations of 18 U.S.C. §§ 1589, 1591, both of

17 which apply extraterritorially under 18 U.S.C. § 1596 if the offender is present in

18 the country, regardless of their alienage or citizenship.

19     282.   Barnett was located in the US during portions of the offenses. At all

20 relevant times, Barnett engaged in travel throughout the United States to expand

21 Stellar Sport's American offices. Upon information and belief, Barnett traveled

22 frequently to Los Angeles for Stellar Group's business deals, various corporate

23 acquisitions, and to negotiate deals for his clients—*e.g.*, Garreth Bale, who signed

24 with the Los Angeles F.C. in 2022.

25     283.   As a direct and proximate result of Defendant's  actions, Ms. Doe has

26 sustained and will continue to sustain monetary damages and economic harm,

27 physical injury, pain and suffering, and serious psychological and emotional

28 distress.

284.   Ms. Doe seeks compensatory damages for the harm suffered as a result of Defendants' forced labor and sex trafficking practices.

285.   Ms. Doe also seeks punitive damages to deter such conduct by Defendants in the future, along with reasonable attorney's fees and costs.

## SECOND CLAIM FOR RELIEF

### Participating in Venture in Violation the TVRPA, 18 U.S.C. §§ 1589(b), 1591(a)(2), 1595

### Against Defendants CAA Stellar and Stellar Limited

286.   Ms. Doe realleges and incorporates by reference all prior Paragraphs as if fully set forth herein.

287.   Ms. Doe is authorized to bring this civil claim against Defendants CAA Stellar and Stellar Limited for violations of section 1589(b) and 1591(a)(2) of the TVPRA pursuant to the civil remedies provision of section 1595(a).

288.   As alleged above, Ms. Doe is informed and believes that CAA Stellar and Stellar Limited are alter egos of each other. Accordingly, both CAA Stellar and Stellar Limited will be referred to herein, individually and collectively, as "Stellar Defendants" unless otherwise distinguished.

289.   Stellar Defendants are liable as a beneficiary of sections 1591(a)(2) and 1589(b), which apply extraterritorially under 18 U.S.C. § 1596 if the offender is present in the U.S., regardless of their alienage or citizenship.

290.   Stellar Defendants are liable under section 1589(b) because they "knowingly benefit[ed], financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means." 18 U.S.C. § § 1589(b).

291.   Stellar Defendants are also liable under section 1591(a)(2) because Stellar Defendants knowingly benefitted from and knowingly assisted, supported,

1    and facilitated Barnett's sex-trafficking activities.

2        292.  Defendant Barnett and Stellar Defendants, together, formed a venture

3    through which Barnett could recruit forced labor and sexual services from his

4    "slaves" under the auspices of employment with Stellar Defendants, and Stellar

5    Defendants received the benefit that Barnett was bringing to the business with his

6    elite clients and record-breaking deals. Barnett and Stellar Defendants were part of

7    a symbiotic relationship in which Stellar Defendants would allow Barnett to use

8    Stellar Defendants as a vehicle through which he could lure and financially entrap

9    his sex slaves, and Stellar Defendants would facilitate Barnett's behavior to keep

10   their rainmaker happy and, in turn, keep his high-profile clients with the agency.

11       293.  Stellar Defendants knowingly benefitted from forced labor and

12   trafficking activities conducted by Barnett. This more than an instance of willful

13   blindness, as Stellar Defendants paid Ms. Doe through its accounts on multiple

14   occasions, facilitated visas for Ms. Doe and her children, paid for Ms. Doe's child's

15   accommodations in South Korea, Stellar Defendants' employees dropped off cash

16   in envelopes to Ms. Doe, Stellar Defendants' agents guaranteed Ms. Does leases,

17   and other actions mentioned in the above paragraphs that show Stellar Defendants'

18   active participation and knowledge of the venture's actions facilitating sex

19   trafficking and forced labor.

20       294.  After having actual knowledge of Barnett's illegal conduct, Stellar

21   Defendants continued to endorse, support and promote Barnett as a means to

22   continue receiving a financial benefit from Defendant Barnett.

23       295.  Stellar Defendants are liable for their violations of 18 U.S.C. §§ 1589,

24   1591, both of which apply extraterritorially under 18 U.S.C. § 1596 if the offender

25   is present in the country, regardless of their alienage or citizenship.

26       296.  CAA Stellar is present in the United States, and has been present in the

27   United States for at all relevant times because CAA Stellar opened its first U.S.

28   office in 2016, before Ms. Doe was trafficked, and CAA Stellar only continued to

grow. Once Stellar Defendants were acquired by ICM, CAA Stellar has maintained an office in the regular course of business in Los Angeles. Therefore, CAA Stellar has been "present" in the United States for purposes of section 1596.

297.   Stellar Limited and CAA Stellar are alter egos of each other, and therefore, share the same contacts for purposes of jurisdiction and "presence" under section 1596. However, even if Stellar Defendants to not share the same presence under section 1596, Stellar Limited has also been present in the United States for all relevant times since CAA Stellar opened its first office in Atlanta because Stellar Limited was one of the incorporators of Stellar USA, Inc. in 2016.

298.   As a direct and proximate result of Stellar Defendants' actions, Ms. Doe has sustained and will continue to sustain monetary damages and economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

299.   Ms. Doe also seeks punitive damages to deter such conduct by Defendants in the future, along with reasonable attorney's fees and costs.

## THIRD CLAIM FOR RELIEF

### Beneficiary Liability Violation of TVPRA, 18 U.S.C. § 1595

### Against Defendants CAA Stellar & Stellar Limited

300.   Plaintiff realleges and incorporates by reference all prior Paragraphs as if fully set forth herein.

301.   As alleged above, CAA Stellar and Stellar Limited are alter egos of each other. Accordingly, both CAA Stellar and Stellar Limited will be referred to herein, individually and collectively, as "Stellar Defendants" unless otherwise distinguished

302.   Defendant Barnett and the Stellar Defendants, together, formed a venture through which Barnett could recruit forced labor and sexual services from his "slaves" under the auspices of employment with CAA Stellar, and the Stellar Defendants received the benefit that Barnett was bringing to the business with his

1  elite clients and record-breaking deals. Barnett and the Stellar Defendants were part
2  of a symbiotic relationship in which Stellar Defendants would allow Barnett to use
3  CAA Stellar as a vehicle through which he could lure and financially entrap his sex
4  slaves, and Stellar Defendants would facilitate Barnett's behavior to keep their
5  rainmaker happy and, in turn, keep his high-profile clients with the agency.

6      303.   Stellar Defendants are liable as beneficiaries of the TVPRA under
7  §1595(a) because, as alleged above in Ms. Doe's Second Claim for Relief, Stellar
8  Defendants knowingly benefitted, financially or by receiving anything of value;
9  from participating in a venture; that defendants knew or should have known has
10  committed of violations of the TVPRA—specifically, section 1589 (forced labor)
11  and/or section 1591 (sex trafficking).

12     304.   For the same reasons that Stellar Defendants are directly liable under
13  sections 1591(a)(2) and 1589(b), that Stellar Defendants knowingly participated in
14  and facilitated these schemes, the Stellar Defendants necessarily meet the lower
15  negligence *mens rea* standard under for civil beneficiary liability under section
16  1595 as they knew, or should have known that the venture in which they
17  participated in with Barnett, engaged in violations of the TVPRA for forced labor
18  and sex trafficking.

19     305.   The Stellar Defendants knowingly benefitted from forced labor and
20  trafficking activities conducted by Barnett. This more than an instance of willful
21  blindness, as Stellar Defendants paid Ms. Doe on multiple occasions, through its
22  accounts, facilitated visas for Ms. Doe and her children, paid for Ms. Doe's child's
23  accommodations in South Korea, and other actions mentioned herein that show
24  active participation and knowing, or truly reckless disregard, of the venture's
25  actions facilitating sex trafficking and forced labor.

26     306.   As a direct and proximate result of Defendants' actions, Ms. Doe has
27  sustained and will continue to sustain monetary damages and economic harm,
28  physical injury, pain and suffering, and serious psychological and emotional

1  distress.

2      307.  Ms. Doe also seeks punitive damages to deter such conduct by

3  Defendants in the future, along with reasonable attorney's fees and costs

4  **FOURTH CLAIM FOR RELIEF**

5  **Beneficiary Liability Violation of TVPRA § 1595**

6  **Against Defendants CAA & CAA Holdings**

7      308.  Plaintiff realleges and incorporates by reference all prior Paragraphs as

8  if fully set forth herein.

9      309.  ***As to Defendant CAA Holdings:*** Under Delaware law, Defendant

10  CAA Holdings acquired ICM's liabilities following the CAA-ICM Merger. ICM

11  was liable as a beneficiary of the TVPRA because ICM knew or should have

12  known about Barnett and the Stellar Group Defendants' nefarious venture when

13  ICM conducted due diligence of the company before acquiring it. After this due

14  diligence period, during which the Stellar Group Defendants were paying Ms. Doe

15  through their accounts and facilitating Child 1's living arrangements under false

16  pretenses, ICM continued to endorse, support and promote Barnett as a means to

17  continue receiving a financial benefit from Defendants Barnett and CAA Stellar. In

18  fact, a large motivator behind CAA's merger with ICM was the global reach of

19  Stellar Sports agency. ICM could not have disavowed their cash cow or done

20  anything to dilute or decrease the value of CAA Stellar without suffering severe

21  financial consequences. Moreover, of note is the timing in which the three former

22  ICM executives stepped down from the CAA Stellar board of directors. Much like

23  Barnett, and the proverbial cat who ate the canary, the three former ICM executives

24  stepped down quietly and immediately after Barnett's own purported resignation.

25      310.  ***As to Defendant CAA:*** Defendant CAA knew or should have known

26  about Barnett and CAA Stellar's nefarious venture when they conducted due

27  diligence before the CAA-ICM Merger. Additionally, once CAA did have proven

28  actual knowledge of Barnett's depraved behavior, it did not support Ms. Doe or

address her attorney's allegations. Instead, CAA continued to endorse, support and promote Barnett as a means to continue receiving a financial benefit from Defendants Barnett and CAA Stellar, and as a means of keeping the clients that they paid so much for. CAA touts Gareth Bale and other CAA Stellar clients as their own—and CAA was happy to fold CAA Stellar into its ranks after scrubbing all mention of Defendant Barnett. Moreover, CAA allowed Barnett to publicly announce his "retirement" as a way to add additional distance between CAA and Barnett while still publicly endorsing him and reaping the value of CAA Stellar.

311.   As a direct and proximate result of Defendants' actions, Ms. Doe has sustained and will continue to sustain monetary damages and economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

312.   Ms. Doe also seeks punitive damages to deter such conduct by Defendants in the future, along with reasonable attorney's fees and costs.

## FIFTH CLAIM FOR RELIEF

### Conspiracy to Violate the TVPRA, 18 U.S.C. §§ 1594(b) 1595

### Against Defendants CAA Stellar and Stellar Limited

313.   Ms. Doe realleges and incorporates by reference all prior Paragraphs as if fully set forth herein.

314.   As alleged above, Ms. Doe is informed and believes that CAA Stellar and Stellar Limited are alter egos of each other. Accordingly, both CAA Stellar and Stellar Limited will be referred to herein, individually and collectively, as "Stellar Defendants" unless otherwise distinguished.

315.   The TVPRA provides a cause of action against "[w]hoever conspires with another to [commit enumerated trafficking violations]." 18 U.S.C. § 1594(b).

316.   As shown in the preceding claims against Stellar Defendants, Stellar Defendants did not just turn a blind eye to Barnett's actions. Stellar Defendants' actions were so affirmatively helpful as to suggest that an agreement was made

1  between Barnett and Stellar Defendants. (*See infra* ¶¶ 306–27).

2    317.   As a direct and proximate result of Defendants' actions, Ms. Doe has

3  sustained and will continue to sustain monetary damages and economic harm,

4  physical injury, pain and suffering, and serious psychological and emotional

5  distress.

6    318.   Ms. Doe also seeks punitive damages to deter such conduct by

7  Defendants in the future, along with reasonable attorney's fees and costs.

8                    **SIXTH CLAIM FOR RELIEF**

9    **Damages for Sexual Assault Under CCP § 340.16; Civil Conspiracy**

10                   **Against All Defendants**

11    319.   Plaintiff realleges and incorporates by reference all prior Paragraphs as

12  if fully set forth herein.

13    320.   Section 340.16, by its terms, is not limited to claims of sexual assault,

14  but applies to any action seeking damages as a result of sexual assault, regardless of

15  the legal theory alleged.

16    321.   Barnett repeatedly sexually assaulted Ms. Doe, as defined under the

17  statute—with his acts of rape, sodomy, forced penetration.

18    322.   Defendants CAA Stellar and Stellar Limited are liable for their

19  facilitating and enabling of Barnett's actions, as well as their actions in furtherance

20  of a conspiracy to cover up Barnett's actions.

21    323.   Defendants CAA Entities are liable under this section for their actions

22  in furtherance of a conspiracy to cover up Barnett's actions. CAA Holdings is also

23  liable for ICM's actions in furtherance of a conspiracy to cover up Barnett's

24  actions.

25    324.   Defendants CAA Stellar and CAA Entities are also liable for the

26  actions of Barnett under agency theory, *respondeat superior*, and negligence theory.

27    325.   As a direct and proximate result of Defendants' actions, Ms. Doe has

28  sustained and will continue to sustain monetary damages and economic harm,

physical injury, pain and suffering, and serious psychological and emotional distress.

326.   Defendants' continuous threats and coercion, as well as Barnett's repeated representations that he would set Ms. Doe free and have his lawyer "take care of things," prevented Ms. Doe from seeking judicial redress earlier. Accordingly, Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Ms. Doe.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**Negligent Supervision and Retention**

**Against Defendant CAA Stellar**

327.   Plaintiff realleges and incorporates by reference all prior Paragraphs as if fully set forth herein.

328.   Defendant CAA Stellar retained Defendant Barnett.

329.   Defendant Barnett was under the control Defendant CAA Stellar.

330.   Defendant CAA Stellar could terminate Defendant Barnett at will.

331.   Defendant CAA Stellar knew or should have known that Defendant Barnett was unfit and that this unfitness created a particular risk to others.

332.   Defendant Barnett's unfitness harmed Plaintiff.

333.   Defendant CAA Stellar's negligence in supervising and retaining Defendant Barnett was a substantial factor in causing Plaintiff's harm.

334.   As a direct and proximate result of Defendants' actions, Ms. Doe has sustained and will continue to sustain monetary damages and economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

335.   Defendants' continuous threats and coercion, as well as Barnett's repeated representations that he would set Ms. Doe free and have his lawyer "take care of things," prevented Ms. Doe from seeking judicial redress earlier. Accordingly, Defendants should be estopped from asserting the statute of

1  limitations as a defense due to the duress exerted upon Ms. Doe.

2  **EIGHTH CLAIM FOR RELIEF**

3  **Negligent Hiring, Retention, and Supervision**

4  **Against Defendant CAA Holdings**

5  336.   Plaintiff realleges and incorporates by reference all prior Paragraphs as

6  if fully set forth herein.

7  337.   As a result of the CAA-ICM Merger, Defendants CAA and CAA

8  Holdings inherited ICM's debts and liabilities, which includes ICM's liabilities for

9  negligent hiring, retention, and supervision.

10  338.   In or about October 2020, ICM hired and/or retained Barnett after ICM

11  acquired Defendant CAA Stellar. At this time, Defendant Barnett became the

12  Executive Chairman of "ICM Stellar Sports," and, upon information and belief,

13  signed a long-term employment contract with ICM.

14  339.   From in or about October 2020 to in or about June 2022, Defendant

15  Barnett was under the control of ICM. During this period, ICM had the power to

16  hire and fire Defendant Barnett, set his pay, and control his work conditions. ICM

17  could terminate Defendant Barnett at will.

18  340.   ICM knew or should have known that Defendant Barnett was unfit and

19  that this unfitness created a particular risk to others.

20  341.   At all relevant times herein, Barnett was communicating with Plaintiff

21  through company-monitored email addresses and devices. As just one example, on

22  February 9, 2021, Defendant Barnett sends an email to Plaintiff, calling her "slave,"

23  from his ICM Stellar Sports work email. Plaintiff also received payments from the

24  Stellar Group Defendants' accounts on multiple occasions in 2020—including

25  January 22, July 31, and September 7, 2020.

26  342.   Defendant Barnett used company resources and his position of power

27  in a prestigious company to solicit additional sex slaves.

28  343.   As a direct and proximate result of Defendants' actions, Ms. Doe has

1  sustained and will continue to sustain monetary damages and economic harm,

2  physical injury, pain and suffering, and serious psychological and emotional

3  distress.

4      344.  Defendants' continuous threats and coercion, as well as Barnett's

5  repeated representations that he would set Ms. Doe free and have his lawyer "take

6  care of things," prevented Ms. Doe from seeking judicial redress earlier.

7  Accordingly, Defendants should be estopped from asserting the statute of

8  limitations as a defense due to the duress exerted upon Ms. Doe.

9  **NINTH CLAIM FOR RELIEF**

10  **Negligent Hiring, Retention, and Supervision**

11  **Against Defendant CAA & CAA Holdings**

12      345.  Plaintiff realleges and incorporates by reference all prior Paragraphs as

13  if fully set forth herein.

14      346.  On or about June 2022, Defendants CAA Entities retained Defendant

15  Barnett after the CAA-ICM Merger.

16      347.  From in or about June 2022 to March 2024, Defendant Barnett was

17  under the control of Defendants CAA Entities. During this period, CAA Entities

18  had the power to hire and fire Defendant Barnett, set his pay, and control his work

19  conditions. Defendants CAA Entities could terminate Defendant Barnett at will.

20      348.  Defendant CAA Entities knew or should have known that Defendant

21  Barnett was unfit and that this unfitness created a particular risk to others.

22      349.  Defendant Barnett's unfitness harmed Plaintiff.

23      350.  Defendants CAA Entities' negligence in hiring, supervising, and

24  retaining Defendant Barnett was a substantial factor in causing Plaintiff's harm.

25      351.  As a direct and proximate result of Defendants' actions, Ms. Doe has

26  sustained and will continue to sustain monetary damages and economic harm,

27  physical injury, pain and suffering, and serious psychological and emotional

28  distress.

**TENTH CLAIM FOR RELIEF**

**Intentional Infliction of Emotional Distress**

**Against Defendant Barnett**

352.   Plaintiff realleges and incorporates by reference all prior Paragraphs as if fully set forth herein.

353.   Defendant Barnett intentionally caused Plaintiff emotional distress by subjecting Plaintiff to repeated acts of rape, torture, violent assaults, threats to Plaintiff's wellbeing and that of her children, and other actions discussed herein taken with intentional and/or reckless disregard for Plaintiff's emotional well-being.

354.   As a result of Defendant Barnett's conduct, Plaintiff suffered legally compensable emotional distress damages. Plaintiff is also entitled to reimbursement for all costs associated with the treatment of the severe emotional distress inflicted by Defendant Barnett.

355.   Defendant Barnett's conduct was a substantial factor in causing Plaintiff's severe emotional distress.

356.   Defendants' continuous threats and coercion, as well as Barnett's repeated representations that he would set Ms. Doe free and have his lawyer "take care of things," prevented Ms. Doe from seeking judicial redress earlier. Accordingly, Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Ms. Doe.

**ELEVENTH CLAIM FOR RELIEF**

**Common Law Negligence**

**Against Defendants CAA Stellar, CAA, and CAA Holdings**

357.   Plaintiff realleges and incorporates by reference all prior Paragraphs as if fully set forth herein.

358.   Defendants, and each of them, owed a duty to Ms. Doe.

359.   Defendants fell below the standard of care required for the reasonable person and resulted in the negligent breach of duties owed to plaintiff.

360.   As a result of Defendants breach of their duties, Ms. Doe suffered legally compensable emotional distress damages, and she is also entitled to all costs associated with the treatment of severe emotional distress inflicted by Defendants.

361.   Defendants' negligence was a substantial factor in causing Ms. Doe's serious emotional harm.

362.   Defendants' continuous threats and coercion, as well as Barnett's repeated representations that he would set Ms. Doe free and have his lawyer "take care of things," prevented Ms. Doe from seeking judicial redress earlier. Accordingly, Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Ms. Doe.

## TWELFTH CLAIM FOR RELIEF

### Negligence Per Se

### Against Defendants CAA Stellar, CAA, and CAA Holdings

363.   Plaintiff realleges and incorporates by reference all prior Paragraphs as if fully set forth herein.

364.   Defendants are responsible for negligence per se in that they failed to protect and take action when one of their employees was committing acts of sexual violence and human trafficking violations under the TVPRA.

365.   As a direct and proximate result of Defendants' actions, Ms. Doe has sustained and will continue to sustain monetary damages and economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

366.   Defendants' continuous threats and coercion, as well as Barnett's repeated representations that he would set Ms. Doe free and have his lawyer "take care of things," prevented Ms. Doe from seeking judicial redress earlier. Accordingly, Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Ms. Doe.

## PRAYER FOR RELIEF

1    WHEREFORE, Plaintiff prays for judgment against all Defendants, and each
2    of them, as follows:

3      1.    Compensatory damages, including, but not limited to, for losses
4             resulting from humiliation, mental anguish, and emotional distress, in
5             amounts to be proven at trial;

6      2.    General and special damages, in amounts to be proven at trial;

7      3.    Pre-judgment and post-judgment interest;

8      4.    Appropriate restitution;

9      5.    Statutory penalties;

10     6.    Interest according to law;

11     7.    Exemplary and punitive damages, in amounts to be proven at trial;

12     8.    Costs;

13     9.    Reasonable attorneys' fees; and

14     10.   For such other and further relief as this Court may deem just and
15             proper.

16

17    **<u>DEMAND FOR TRIAL BY JURY</u>**

18    Pursuant to Rule 38 of the *Federal Rules of Civil Procedure*, Plaintiff
19    demands a trial by jury on all claims so triable.

20

21

22    Date: July 2, 2025        By:       /s/ Lisa H. Quinlan

23                            Lisa H. Quinlan (Cal. Bar No. 108549)
24                            lquinlan@quinlanfirm.com
                               William J. Quinlan (*pro hac vice*
25                            *forthcoming*)
26                            wjq@quinlanfirm.com
                               Eric T. Schmitt (Cal. Bar No. 331174)
27                            eschmitt@quinlanfirm.com
28                            **THE QUINLAN LAW FIRM, LLC**

233 South Wacker Drive, Suite 6142
Chicago, Illinois 60606
Telephone (312) 629-6022
Facsimile (312) 630-7939

Tamara Holder (*pro hac vice forthcoming*)
tamara@tamaraholder.com
**THE LAW FIRM OF TAMARA N.**
**HOLDER, LLC**
917 W. Washington Blvd., Ste. 222
Chicago, Illinois 60607
Telephone: (312) 440-9000

Jeff Augustini (Cal. Bar No. 178358)
jeff@augustinilaw.com
**LAW OFFICE OF JEFF AUGUSTINI**
100 Bayview Circle, Suite 210
Newport Beach, California 92660
Telephone: (949) 336-7847

*Attorneys for Plaintiff Jane Doe*